# EXHIBIT B

ELECTRONICALLY FILED - 2019 May 23 9:42 AM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202045

| | | |
|---|---|---|
| STATE OF SOUTH CAROLINA | ) | IN THE COURT OF COMMON PLEAS |
| | ) | |
| COUNTY OF LEXINGTON | ) | ELEVENTH JUDICIAL CIRCUIT |
| | ) | |
| Prospect Capital Corp., | ) | Civil Action No. |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| Wellspring Capital Management LLC; | ) | **SUMMONS** |
| Wellspring Capital Partners IV, L.P.; WCM | ) | |
| GenPar IV, L.P.; WCM GenPar IV GP, | ) | |
| LLC; Alexander E. Carles; William F. | ) | |
| Dawson, Jr.; John E. Morningstar; Bradley | ) | |
| Johnson; F. Hewitt Grant; Charles E. | ) | |
| Walker, Jr.; Todd Boehly; Bernard Ziomek; | ) | |
| Andrew Kupchik; and John Does One | ) | |
| through One Hundred, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

TO THE DEFENDANTS ABOVE-NAMED:

YOU ARE HEREBY SUMMONED and required to answer the Complaint in this action, a copy of which is herewith served upon you, and to serve a copy of your Answer to the Complaint upon the subscribers at their office at 1310 Gadsden Street, Post Office Box 11449, Columbia, South Carolina, 29211, within thirty (30) days after the service hereof, exclusive of the date of such service. The Plaintiff does hereby notify you that in case of your failure to do so, judgment by default will be rendered against you for the relief demanded in the Complaint.

[Signature Page Follows]

ELECTRONICALLY FILED - 2019 May 23 9:42 AM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202045

s/ Kevin K. Bell
_____

Kevin K. Bell [S.C. Bar No. 65495]
Mary McDonald Campolong [S.C. Bar No. 102317]
ROBINSON GRAY STEPP & LAFFITTE, LLC
Post Office Box 11449
Columbia, South Carolina 29211
(803) 929-1400
kbell@robinsongray.com
mmcdonald@robinsongray.com

Counsel for Plaintiff

May 23, 2019

ELECTRONICALLY FILED - 2019 May 23 9:42 AM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202045

| | | |
|---|---|---|
| STATE OF SOUTH CAROLINA | ) | IN THE COURT OF COMMON PLEAS |
| | ) | |
| COUNTY OF LEXINGTON | ) | ELEVENTH JUDICIAL CIRCUIT |
| | ) | |
| Prospect Capital Corp., | ) | Civil Action No. |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| Wellspring Capital Management LLC; | ) | **COMPLAINT** |
| Wellspring Capital Partners IV, L.P.; WCM | ) | |
| GenPar IV, L.P.; WCM GenPar IV GP, | ) | **JURY TRIAL DEMANDED** |
| LLC; Alexander E. Carles; William F. | ) | |
| Dawson, Jr.; John E. Morningstar; Bradley | ) | |
| Johnson; F. Hewitt Grant; Charles E. | ) | |
| Walker, Jr.; Todd Boehly; Bernard Ziomek; | ) | |
| Andrew Kupchik; and John Does One | ) | |
| through One Hundred, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

Plaintiff Prospect Capital Corp. ("**Prospect**"), by and through its undersigned attorneys, hereby brings this action against (1) Wellspring Capital Management LLC ("**Wellspring Capital**"); (2) Wellspring Capital Partners IV, L.P. ("**Wellspring IV**"), WCM GenPar IV, L.P., WCM GenPar IV GP, LLC, F. Hewitt Grant, Charles E. Walker, Jr., Todd Boehly, Bernard Ziomek, Andrew Kupchik, and John Does One through One Hundred (collectively, the "**Transferee Defendants**"); and (3) Alexander E. Carles, William F. Dawson, Jr., John E. Morningstar, and Bradley Johnson (together with Wellspring Capital, the "**D&O Defendants**") and alleges as follows:

## NATURE OF THE ACTION

1.      In 2012 and 2013, Prospect loaned collectively $160 million to Ellett Brothers, LLC ("**Ellett**"), a national hunting and sporting goods distributor, and several of its subsidiaries,

ELECTRONICALLY FILED - 2019 May 23 9:42 AM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202045

including Evans Sports, Inc., Jerry's Sports, Inc., Simmons Gun Specialties, Inc., Bonitz Brothers, Inc., and Outdoor Sports Headquarters, Inc. (collectively, the "**Borrowers**").

2.      The Borrowers, however, did not use the proceeds of the loans to invest in the business.  Rather, Wellspring Capital, the Transferee Defendants, and the D&O Defendants, caused Ellett to voluntarily use the loan proceeds from Prospect, plus the proceeds of additional loans from other lenders, to pay the Transferee Defendants a total of $188,864,420.94 in cash distributions (the "**Fraudulent Conveyances**"), with approximately 97% of the amount distributed, or $183,169,466.94, going to Wellspring IV—the controlling and largest shareholder of the Borrowers (through additional affiliated entities).[1]

3.      These distributions—totaling $134,003,871.20 in 2012 (the "**2012 Fraudulent Conveyance**") and $54,860,549.74 in 2013 (the "**2013 Fraudulent Conveyance**")—provided no value to Ellett, its subsidiaries, or its direct and indirect parent companies, United Sporting Company, Inc. ("**United Sporting**") and SportCo Holdings, Inc. ("**SportCo**").

4.      Since making the distributions in 2012 and 2013, and despite a historic industry-wide increase in sales, Ellett and its many subsidiaries have lost a substantial amount of their assets and business value.  As a result, its liabilities, including those owed to Prospect, now far exceed its assets.  The Borrowers (and United Sporting and SportCo (together, the "**Guarantors**"), each of which guaranteed the Borrowers' obligations under the loans) have failed to retain sufficient property to pay the indebtedness owed to Prospect.

5.      Indeed, despite Ellett's insolvency and financial struggles, neither Wellspring IV nor the other shareholders that received the Fraudulent Conveyances have made any capital

---

[1] On information and belief, Ellett made an additional, separate distribution of approximately $17 million to the Transferee Defendants in 2012 prior to making the Fraudulent Conveyances.

ELECTRONICALLY FILED - 2019 May 23 9:42 AM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202045

contributions to the company to support the business. Instead, as described more fully below, Wellspring Capital and the D&O Defendants grossly and recklessly mismanaged the business and carried out their respective roles in a manner that was devoid of reasonable inquiry and diligence in dereliction of their fiduciary duties to Prospect as a creditor of the increasingly insolvent enterprise.

6. On December 31, 2018, the Borrowers defaulted on the Prospect loans. Ellett, United Sporting, and SportCo were insolvent as of the date of default. The Borrowers and the Guarantors each failed to retain sufficient property to pay its creditor, Prospect, when the debt owed to Prospect came due. Moreover, knowing that the Borrowers cannot pay the amounts due to Prospect, Wellspring Capital and the D&O Defendants are now threatening to put the companies into bankruptcy.

7. Because both the Borrowers and the Guarantors are now hopelessly insolvent, Prospect brings this action to recover $160 million of the $189 million in distributions made to the Transferee Defendants as fraudulent under the South Carolina Statute of Elizabeth.

8. Through this action, Prospect also alleges causes of action against the D&O Defendants for breach of fiduciary duty. Given the company's state of insolvency by at least early 2017, and in their capacities as fiduciaries of Ellett, the D&O Defendants owed fiduciary duties directly to Prospect, which was, at all relevant times, a creditor of Ellett.

9. From at least early 2017, in addition to their gross mismanagement of the Borrowers, the D&O Defendants repeatedly and recklessly induced Prospect to forbear from enforcing its rights under the applicable credit documents. The D&O Defendants' acts and omissions constituted bad faith dereliction of duty that they did not believe to be in the best interest of Prospect.

ELECTRONICALLY FILED - 2019 May 23 9:42 AM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202045

10.    The bad faith dereliction of duty by the D&O Defendants was reckless and devoid of reasonable inquiry and diligence that would have led an officer or director of ordinary prudence to avoid inducing Prospect to forbear on the exercise of its rights given the ongoing and significant dissipation of value to its security interests.  The D&O Defendants' breach of fiduciary duties owed to Prospect caused Prospect to suffer direct, particularized harm, including millions of dollars in damages to be determined based on the value that it would have received through enforcing its rights to payment and collateral rather than being wrongfully induced to postpone action through the reckless conduct of the D&O Defendants.

## PARTIES

### A.    Plaintiff

11.    Plaintiff Prospect is a Maryland corporation whose principal place of business is 10 East 40th Street, 44th Floor, New York, New York 10016. Prospect is a publicly traded business development company that makes loans to middle-market companies across the United States. Prospect made the loans whose proceeds were used by Defendants to effectuate the Fraudulent Conveyances.

### B.    Defendants

12.    Defendant Wellspring Capital Management LLC is a Delaware limited liability company with its principal place of business at 390 Park Avenue, New York, New York 10022. At the time of the Fraudulent Conveyances and at all times thereafter, Wellspring Capital controlled (a) Wellspring IV, the largest shareholder of SportCo; (b) SportCo's and United Sporting's boards of directors, and (c) SportCo, United Sporting, and each of the Borrowers. Furthermore, at all times relevant hereto, Wellspring Capital served as the manager of SportCo pursuant to the terms of a management agreement. In each of these capacities, Wellspring Capital

ELECTRONICALLY FILED - 2019 May 23 9:42 AM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202045

owed Ellett and its subsidiaries the fiduciary duties of good faith, candor, due care, and absolute

loyalty. Each Borrower and Guarantor acted at the direction and for the benefit of Wellspring

Capital.

13.    Defendant Wellspring Capital Partners IV, L.P. is a New York limited partnership

with its principal place of business at 390 Park Avenue, New York, New York 10022. Wellspring

IV is, and at all relevant times was, SportCo's private equity sponsor and largest shareholder,

holding a controlling ownership stake in SportCo. As SportCo's largest shareholder, Wellspring

IV received approximately 97% of the total amount of Fraudulent Conveyances.

14.    Defendant WCM GenPar IV, L.P. is a New York limited partnership with its

principal place of business at 390 Park Avenue, New York, New York 10022. WCM GenPar IV,

L.P. is the general partner of Wellspring IV. As such, WCM GenPar IV, L.P. is liable to Prospect

to the same extent as Wellspring IV.

15.    Defendant WCM GenPar IV GP, LLC is a New York limited liability company

with its principal place of business at 390 Park Avenue, New York, New York 10022. WCM

GenPar IV GP, LLC is the general partner of WCM GenPar IV, L.P. As such, WCM GenPar IV,

LLC is liable to Prospect to the same extent as WCM GenPar IV, L.P.

16.    Defendant Alexander E. Carles is an individual who is (and at all relevant times

was) a Managing Partner of Wellspring Capital. Carles also served as an officer and director of

SportCo, United Sporting, and many of Ellett's subsidiaries (including Borrower Evans Sports,

Inc., a corporation organized under the laws of South Carolina). In that capacity, Carles owed

Ellett and its subsidiaries the fiduciary duties of good faith, candor, due care, and absolute loyalty.

Upon information and belief, Carles is a citizen and resident of the State of Connecticut.

ELECTRONICALLY FILED - 2019 May 23 9:42 AM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202045

17.    Defendant William F. Dawson, Jr. is an individual who is (and at all relevant times was) the Chief Executive Officer of Wellspring Capital. Dawson also served as a director of SportCo, United Sporting, and many of Ellett's subsidiaries (including Borrower Evans Sports, Inc., a corporation organized under the laws of South Carolina). In that capacity, Dawson owed Ellett and its subsidiaries the fiduciary duties of good faith, candor, due care, and absolute loyalty. Upon information and belief, Dawson is a citizen and resident of the State of New York.

18.    Defendant John E. Morningstar is an individual who is (and at all relevant times was) a Managing Partner of Wellspring Capital. Morningstar also served as a director of SportCo, United Sporting, and many of Ellett's subsidiaries (including Borrower Evans Sports, Inc., a corporation organized under the laws of South Carolina). In that capacity, Morningstar owed Ellett and its subsidiaries the fiduciary duties of good faith, candor, due care, and absolute loyalty. Upon information and belief, Morningstar is a citizen and resident of the State of Connecticut.

19.    Defendant Bradley Johnson is an individual who is (and at all relevant times was) the President and Chief Executive Officer of SportCo, United Sporting, and many of Ellett's subsidiaries (including Borrower Evans Sports, Inc., a corporation organized under the laws of South Carolina). In that capacity, Johnson owed Ellett and its subsidiaries the fiduciary duties of good faith, candor, due care, and absolute loyalty. Upon information and belief, Johnson is a citizen and resident of the State of South Carolina.

20.    Defendant F. Hewitt Grant was an equity-holder of SportCo at the time of the Fraudulent Conveyances and a recipient of the Fraudulent Conveyances. Upon information and belief, Grant is a citizen and resident of the State of South Carolina.

ELECTRONICALLY FILED - 2019 May 23 9:42 AM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202045

21.    Defendant Charles E. Walker, Jr. was an equity-holder of SportCo at the time of the Fraudulent Conveyances and a recipient of the Fraudulent Conveyances. Upon information and belief, Walker is a citizen and resident of the State of Maryland.

22.    Defendant Todd Boehly was an equity-holder of SportCo at the time of the Fraudulent Conveyances and a recipient of the Fraudulent Conveyances. Upon information and belief, Boehly is a citizen and resident of the State of Connecticut.

23.    Defendant Bernard Ziomek was an equity-holder of SportCo at the time of the Fraudulent Conveyances and a recipient of the Fraudulent Conveyances. Upon information and belief, Ziomek is a citizen and resident of the State of Pennsylvania.

24.    Defendant Andrew Kupchik was an equity-holder of SportCo at the time of the Fraudulent Conveyances and a recipient of the Fraudulent Conveyances. Upon information and belief, Kupchik is a citizen and resident of the State of New Jersey.

25.    Defendants John Does One through One Hundred are yet-to-be-identified subsequent transferees who received proceeds from the Fraudulent Conveyances from one or more of the Transferee Defendants.

**C.    Relevant Non-Parties**

26.    SportCo Holdings, Inc. is a Delaware corporation with its principal place of business in and headquarters at 267 Columbia Avenue, Chapin, South Carolina. SportCo is the parent and 100% owner of United Sporting and an indirect parent of Ellett. SportCo is a guarantor of all payments owned by the Borrowers under the Prospect loans.

27.    United Sporting Companies, Inc. is a Delaware corporation with its principal place of business and headquarters at 267 Columbia Avenue, Chapin, South Carolina. United Sporting

ELECTRONICALLY FILED - 2019 May 23 9:42 AM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202045

Companies, Inc. is the parent company and 100% owner of Borrower Ellett Brothers, LLC. United Sporting is also a guarantor of all payments owed by the Borrowers under Prospect's loans.

28.    Ellett Brothers, LLC is a South Carolina limited liability company with its principal place of business and headquarters at 267 Columbia Avenue, Chapin, South Carolina. Ellett's sole and managing member is United Sporting. Ellett is the parent company of additional non-party Borrowers Evans Sports, Inc.; Jerry's Sports, Inc.; Simmons Gun Specialties, Inc.; Bonitz Brothers, Inc.; and Outdoor Sports Headquarters, Inc.—each of which has its chief executive office and principal place of business in Chapin, South Carolina. Each Borrower is jointly and severally liable for and a guarantor of payments owed to Prospect under the loans.

## JURISDICTION AND VENUE

29.    All Defendants have transacted business in South Carolina, have caused tortious injury in South Carolina, have derived substantial revenue from services rendered in South Carolina, and have had sufficient contacts with South Carolina to support the exercise of personal jurisdiction over the matters set forth in this Complaint.

30.    Venue is appropriate in the Court of Common Pleas for Lexington County because each Borrower and Guarantor has their principal place of business and headquarters in Lexington County, and the most substantial part of the alleged acts and omissions in South Carolina that give rise to this controversy occurred in Lexington County.

## STATEMENT OF FACTS

**A.    Ellett and its predecessors built a venerable South Carolina company prior to Wellspring Capital's greedy and disastrous management.**

31.    Ellett's proud history began in 1933, in the midst of the Great Depression, as Ellett Brothers, Inc. The company was established in Chapin, South Carolina, where it operated as a regional sporting goods distributor. Initially, the company distributed fishing equipment

ELECTRONICALLY FILED - 2019 May 23 9:42 AM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202045

exclusively, deriving all of its business from fulfilling the requests of independent sporting goods dealers located in its home state, North Carolina, and Georgia. For the first quarter century of its existence, Ellett operated as such, serving a three-state territory with fishing equipment during the economically depressed 1930s and throughout the 1940s.

32.     In 1957, Ellett began distributing hunting and shooting sports products and outdoor accessories throughout an expanded geographical area. The foray into hunting and shooting products and outdoor accessories marked the introduction of what quickly would become the company's core business, a product line that has defined Ellett since the 1960s. Not long after this signal move, the company abandoned its original business by discontinuing the distribution of fishing equipment. From the 1960s forward, Ellett's sales force focused on selling firearms and outdoor accessories to a largely rural clientele comprised mainly of independent, "mom-and-pop" retailers.

33.     During the early 1970s, Ellett's management directed a group of its salespeople to market the company's products over the telephone, marking the beginning of telemarketing at the Chapin headquarters. By the late 1970s, Ellett ranked as a leading national distributor of outdoor sporting goods products thanks largely to the effectiveness of its less-than-decade-old telemarketing program.

34.     The company went public in June 1993, making its initial public offering at $9 a share, and went on to record a banner year. Half of Ellett's 240 employees were employed as salespeople in 1993, all of whom were stationed at the company's headquarters in Chapin, the sole location of Ellett's operations. The company survived and flourished through the 1990s.

35.     Wellspring IV acquired Ellett in 2008 and formed SportCo as a holding company to hold United Sporting (Ellett's direct parent), Ellett, and Ellett's subsidiaries indirectly.

ELECTRONICALLY FILED - 2019 May 23 9:42 AM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202045

36.    In the run-up to the re-election of President Obama in 2012 and in the months following the election, Ellett achieved record sales and earned revenues of approximately $1.2 billion in the twelve-month period from October 2012 to October 2013.

37.    As recently as 2015, Ellett was the fifth largest private company in South Carolina and the largest distributor of firearms in the United States, with annual revenues of $750 million, over 350 employees nationwide, and 175 employees in South Carolina. Ellett operated a 250,000 sq. ft. distribution center and sales office in Chapin, South Carolina and a 140,000 sq. ft. distribution facility in Newberry, South Carolina. Ellett's broad customer base consisted of 30,000 independent retailers in all 50 states, offering over 85,000 products.

38.    Once again, in 2016, the firearms industry, as a whole, achieved record sales. But, while Ellett's sales increased, its profits lagged significantly behind its competitors. Ellett's earnings in 2016 were approximately $40 million less than those achieved in 2012 during a similar sales boon, and similar to those achieved prior to Wellspring IV's acquisition of Ellett with significantly lower industry-wide sales.

39.    Despite these recent periods of elevated sales, the D&O Defendants completely ruined Ellett, which is now on the brink of extinction. Ellett survived the Great Depression, serious recessions in the 1970s, 1990s and 2000s, and legislation banning certain of its products. But Ellett could not survive the disastrous tenure of the D&O Defendants, who caused Ellett to make the Fraudulent Conveyances and whose reckless and grossly negligent mismanagement of Ellett and bad faith dereliction of their duties led to the dissipation of substantially all of Ellett's assets during some of the most historically profitable times for companies in the firearms industry.

ELECTRONICALLY FILED - 2019 May 23 9:42 AM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202045

**B.**    **The Transferee Defendants extract almost $189 million from Ellett.**

40.    On September 28, 2012, various lenders, including Prospect, collectively loaned $280 million to the Borrowers (the "**2012 Loan**").[2]  Prospect provided $100 million of the total loan amount pursuant to a September 28, 2012 Second Lien Loan and Security Agreement.  The proceeds from Prospect's 2012 Loan were wired to Ellett in South Carolina.

41.    The Borrowers used approximately $139.6 million of the loan proceeds received from the first-lien lenders to repay the Borrowers' existing debts.  The Borrowers and Guarantors then used the proceeds of the 2012 Loan to fund distributions to their members and shareholders, including each Transferee Defendant.  Specifically, using funds from the 2012 Loan, Wellspring Capital and the D&O Defendants caused Ellett to pay $134,003,871.20 to the Transferee Defendants as cash distributions.[3]

42.    Ellett voluntarily made the 2012 Fraudulent Conveyances without receiving any consideration in exchange for its disbursement of the $134,003,871.20. On information and belief, Ellett paid these distributions to the Transferee Defendants on or about October 1, 2012.

43.    On March 7, 2013, Prospect, the Borrowers, and other parties entered into a First Amendment to Third Amended and Restated Loan and Security Agreement and Consent (the "**2013 Loan**").  Pursuant to the 2013 Loan, Prospect provided an additional $60 million to the

---

[2] Bank of America, Wells Fargo, Regions Bank, Summit Partners Credit Fund, LP, and their respective related entities provided the remainder of the 2012 Loan.

[3] Specifically, the 2012 Loan provided that on or after its closing date, the Transferee Defendants would receive a "one-time cash Distribution," which would be made by "Borrowers to [United Sporting] (for further distribution to SportCo and Wellspring and the other shareholders of SportCo)." The Fraudulent Conveyances, however, went directly from Ellett to the Transferee Defendants.

ELECTRONICALLY FILED - 2019 May 23 9:42 AM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202045

Borrowers. On or after the closing date of the loan, Ellett voluntarily transferred $54,860,549.74 to the Transferee Defendants as cash distributions.

44.    Ellett made the 2013 Fraudulent Conveyance without receiving any consideration in exchange for its disbursement of the $54,860,549.74. On information and belief, Ellett paid this distribution to the Transferee Defendants on or about March 7, 2013.

45.    All told, the Fraudulent Conveyances resulted in the transfer of $188,864,420.94 to the Transferee Defendants, broken down as follows:

> a.  Defendants Wellspring; Wellspring Capital Partners IV, L.P.; WCM GenPar IV, L.P.; and WCM GenPar IV GP, LLC received dividends of $130,024,072.35 via the 2012 Fraudulent Conveyance and $53,145,394.59 via the 2013 Fraudulent Conveyance;
>
> b.  Defendant Grant received dividends of $667,430.68 via the 2012 Fraudulent Conveyance and $287,639.45 via the 2013 Fraudulent Conveyance;
>
> c.  Defendant Walker received dividends of $66,684.06 via the 2012 Fraudulent Conveyance and $28,738.51 via the 2013 Fraudulent Conveyance;
>
> d.  Defendant Boehly received dividends of $1,967,081.28 via the 2012 Fraudulent Conveyance and $847,743.75 via the 2013 Fraudulent Conveyance;
>
> e.  Defendant Ziomek received dividends of $98,354.06 via the 2012 Fraudulent Conveyance and $42,387.19 via the 2013 Fraudulent Conveyance; and
>
> f.  Defendant Kupchik received dividends of $1,180,248.77 via the 2012 Fraudulent Conveyance and $508,646.25 via the 2013 Fraudulent Conveyance.

ELECTRONICALLY FILED - 2019 May 23 9:42 AM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202045

46.     The following chart provides a summary of the amounts and recipients in the Fraudulent Conveyances:

| Transferee Defendant | 2012 Fraudulent Conveyances | 2013 Fraudulent Conveyances | Total |
|---|---|---|---|
| Defendants Wellspring; Wellspring Capital Partners IV, L.P.; WCM GenPar IV, L.P.; and WCM GenPar IV GP, LLC | $130,024,072.35 | $53,145,394.59 | $183,169,466.94 |
| Defendant Grant | $667,430.68 | $287,639.45 | $955,070.13 |
| Defendant Walker | $66,684.06 | $28,738.51 | $95,422.57 |
| Defendant Boehly | $1,967,081.28 | $847,743.75 | $2,814,825.03 |
| Defendant Ziomek | $98,354.06 | $42,387.19 | $140,741.25 |
| Defendant Kupchik | $1,180,248.77 | $508,646.25 | $1,688,895.02 |
| Total: | $134,003,871.20 | $54,860,549.74 | $188,864,420.94 |

47.     The Fraudulent Conveyances took much needed funds from Ellett to line Defendants' pockets (including but not limited to the payment of transaction and other "fees" to Wellspring Capital)—all to the detriment of the Borrowers' and Guarantors' creditors, including Prospect.

48.     Upon information and belief, Wellspring IV subsequently transferred proceeds that Wellspring IV received from the Fraudulent Conveyances to John Does One through One Hundred, each of whom was an investor in Wellspring IV or was a Wellspring Capital shareholder, officer, director, manager, executive, or partner.

49.     On December 31, 2018, the Borrowers defaulted on Prospect's loans by failing to pay interest when due.  This default was directly and proximately caused by the Fraudulent Conveyances, as a result of which, on December 31, 2018, the Borrowers and Guarantors lacked sufficient assets to repay their debts as they came due.  Ellett, SportCo, and United Sporting were insolvent at the time that the Borrowers defaulted on their debt to Prospect and remain insolvent.

ELECTRONICALLY FILED - 2019 May 23 9:42 AM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202045

**C.**    **The D&O Defendants' bad faith dereliction of duty destroys Ellett and causes
particular harm to Prospect.**

50.    Once the Transferee Defendants had obtained the Fraudulent Conveyances, the
D&O Defendants had no incentive to, and did not, manage Ellett loyally or with good faith and
due care.  To the detriment of Prospect, the D&O Defendants mismanaged Ellett with gross
negligence and continued to allow Ellett to hemorrhage needed cash.

51.    In the run-up to the 2016 U.S. Presidential election, demand for and sales of
firearms spiked to record levels on an industry-wide basis.

52.    However, as a result of the D&O Defendants' grossly negligent mismanagement in
bad faith dereliction of their duties, Ellett dramatically underperformed relative to its competitors
and the market, and Ellett's financial condition has deteriorated ever since.  As a result of this
gross mismanagement and bad faith dereliction of duty, Ellett became deeply insolvent in the
aftermath of the 2016 Presidential election to the present.

53.    Moreover, because at all times relevant to this Complaint Ellett was United
Sporting's only asset, and United Sporting was SportCo's only asset, both United Sporting and
SportCo were insolvent to the same extent as Ellett.

54.    In the private equity industry, companies commonly use Earnings Before Interest,
Taxes, Depreciation and Amortization ("EBITDA") as a metric for the financial health of a
company.  Ellett's LTM (last twelve months) EBITDA fell from approximately $80 million on the
eve of the 2013 Loan to approximately $35 million by the end of 2015, to less than zero now.  In
other words, Ellett suffered a complete financial collapse.

55.    Despite this long and continuous financial collapse in the face of industry-wide
historic sales performance, Wellspring Capital collected "management fees" from Ellett or its

ELECTRONICALLY FILED - 2019 May 23 9:42 AM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202045

affiliates in the amount of $750,000 per annum from 2009 to 2017, totaling approximately $6 million.

56.     On information and belief, the D&O Defendants also caused Ellett and its subsidiaries to purchase excess and unsaleable inventory, solely to artificially maintain a robust borrowing base, which was tied to inventory valuations on Ellett's books and records. The D&O Defendants recklessly, and without reasonable or diligent inquiry, caused Ellett to artificially inflate its borrowing base so that it could borrow more money from its revolving line of credit, which the D&O Defendants failed to disclose to Prospect when they wrongfully caused Prospect to operate under the false impression that the Borrowers could continue to service their debts, including paying Prospect the ongoing interest obligations due under the 2012 and 2013 Loans.

57.     The D&O Defendants also recklessly and without reasonable inquiry caused Ellett to materially overstate the value of the inventory on Ellett's books and records, causing significant harm to Prospect, which relied upon such information along with the D&O Defendants' other reckless communications in determining whether and when to exercise its rights.

58.     The D&O Defendants' reckless manipulation of Ellett's borrowing base and overstatement of the value of its inventory temporarily prevented Ellett from technically defaulting on its interest payments, but in fact caused Ellett's insolvency to deepen to the direct detriment of Prospect and its security interests in the Borrowers and Guarantors.

59.     Further, the manipulation of Ellett's financial data concealed the true state of Ellett's disastrous financial condition from Prospect.

60.     As a direct result of (a) the 2012 and 2013 Fraudulent Conveyances; and (b) the D&O Defendants' reckless and grossly negligent mismanagement through bad faith dereliction of duty, Prospect was induced to enter into additional financings of Ellett and amendments to its

ELECTRONICALLY FILED - 2019 May 23 9:42 AM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202045

existing financings. For example, in May 2017, Prospect amended its loans to permit Ellett to avoid a covenant default. Prospect agreed to 2% incremental payment-in-kind interest and a 3.48% equity stake in SportCo (Ellett's indirect parent) as compensation for such accommodations—compensation that the D&O Defendants knew or were reckless in not knowing had no value. These additional financings and amendments caused direct and particularized harm to Prospect.

61.     In early 2018, Wellspring Capital notified Prospect that the Borrowers would default on the interest payment due to Prospect in the amount of $4.7 million in the second quarter of 2018. Because the Transferee Defendants had already received the Fraudulent Conveyances and other cash distributions at the Borrowers' expense—effectively extracting all value out of the enterprise—and their equity in Ellett was by this time worthless, the Transferee Defendants had no financial incentive to address the company's dire cash situation and lacked any concern for the fiduciary duties they owed to Prospect. Rather, the D&O Defendants primary concern was to keep the enterprise ostensibly afloat for as long as possible to continue collecting fees at the expense of Prospect.

62.     In April 2018, Prospect, however, again agreed to amend its loan based upon reckless misrepresentations made by the D&O Defendants in conjunction with a proposal for Ellett to purchase certain assets of AcuSport Corporation ("**AcuSport**"), another firearms distributor.

63.     To induce Prospect to forgo exercising its bargained-for remedies in the event of a payment default, starting in October 2017, Wellspring Capital, through Defendant Carles and Defendant Johnson, the United Sporting President and Chief Executive Officer under Wellspring Capital's control, represented that Ellett could purchase certain assets of AcuSport, a competitor, for $14.8 million. These assets included a distribution center, an office building, information technology resources, and inventory (the "**AcuSport Purchase**").

ELECTRONICALLY FILED - 2019 May 23 9:42 AM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202045

64.     The AcuSport Purchase required USC to pay $2 million in fees and spend another $5.4 million in closing, transaction, and restructuring costs, draining further precious liquidity from USC.

65.     The D&O Defendants recklessly, and without reasonable diligence or inquiry, misrepresented to Prospect that the AcuSport Purchase would result in: (a) USC capturing 20% to 30% of AcuSport sales; (b) USC acquiring $14 million worth of AcuSport inventory at a substantial discount; and (c) an immediate realization of a $7 million profit on the sale of the AcuSport inventory purchased in the AcuSport Purchase.

66.     On October 27, 2017, Carles misrepresented in writing to Rich Carratu of Prospect that "the only way to optimize is to merge with Acusport".

67.     On November 12, 2017, Carles further dialed up the purported urgency and benefits of the AcuSport Purchase, writing to Mr. Carratu: "You know your [Prospect's] rights better than me, but I'm not going to beat around the bush... If you think Acusport must get done, I would go to committee tomorrow and figure out what you can live with.  Brad and I know the business a lot better and we think it must get done. . . .  We need to make the merger happen or deal with the consequences which could be severe."

68.     On December 26, 2017, in the context of the D&O Defendants' reckless efforts to get Prospect to defer its contractual entitlement to interest payments, Carles wrote to Mr. Carratu: "So you will waive [your interest payments].  Otherwise you cannot get paid."

69.     As Prospect took time to consider the information provided to it by the D&O Defendants, on January 31, 2018, Carles wrote to Mr. Carratu and representatives from Ellett and Summit: "I'm really close to telling Rich [Carratu] to suck my d***."

ELECTRONICALLY FILED - 2019 May 23 9:42 AM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202045

70.     In the ensuing months, Carles repeatedly slandered Mr. Carratu and Prospect as "dumb as f**k", "Dumbf**ks", "so f**kin dumb", and other variations on the same theme in numerous emails to Mr. Carratu (on which Carles copied other lenders and company management)—although the Borrowers and Guarantors owed Prospect $160 million which was now held by the Transferee Defendants.  His bravado masked his complete and utter failure to engage in basic reasonable inquiry and diligence to comply with the fiduciary duties that he and the other D&O Defendants owed to Prospect.

71.     On February 20, 2018, Carles recklessly continued to tout the benefits of pursuing the AcuSport Purchase, writing to Mr. Carratu that "waiting was a mistake."  He followed up with another email that evening: "You're [sic] economics are going down and the risk of chapter is going up.  Sounds like a tidy deal at year end [2017] made a lot of sense."

72.     Defendant Johnson also made reckless misrepresentations about the value of AcuSport inventory that induced Prospect to agree to the AcuSport Purchase, including on March 2, 2018, when he wrote to Mr. Carratu and others: "if I can't get in product to increase my borrowing base by the end of the quarter, the interest payment will be at risk……and it shouldn't be.  Sales are good.  The receivables are strong.  But if I can't get product, my borrowing base will be significantly impacted.  I implore you to get it signed asap."  His statements, like those of the other D&O Defendants were reckless and devoid of reasonable inquiry and diligence that would have revealed to a person of ordinary prudence that the deal made no sense and that Prospect needed to quickly move forward with the enforcement of its rights to avoid further direct and particular harm.

73.     On March 16, 2018, Johnson wrote another email recklessly touting supposed synergies and savings of consolidating three USC facilities into the AcuSport facility.

ELECTRONICALLY FILED - 2019 May 23 9:42 AM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202045

74.     Carles supplemented Johnson's reckless statements by continuing to pressure Prospect into agreeing to the AcuSport Purchase: "Gotta get your interest?  The company will explode Rich! We are hiring lawyers and advisors. . . .  If you don't care then ignore the warnings I give you.  THIS IS SERIOUS.  ACT FAST.  PRESERVE YOUR PRINCIPAL.  PROTECT THE EMPLOYEES."

75.     On April 11, 2018, Johnson wrote to Prospect that the "[l]ayered case with recovery of Acusport volumes (2017 $400M)" was "$100M in sales" as the low case and "$200M in sales" as the high case.

76.     On April 17, 2018, a subordinate of Defendant Johnson's wrote to Prospect: "Attached is our deck that walks you through our base case which assumes no acquisition of assets and then scenarios where we acquire the assets and recover 20% and 30% of AcuSport's historical sales."

77.     On April 27, 2018, Carles wrote more reckless statements to Prospect: "What is the problem?  There is no time for games.  Acusport needs to file and we need to buy it.  THIS IS FOR YOUR BENEFIT – THIS WILL HELP YOUR RECOVERY – THIS WILL MAKE THE BUSINESS STRONGER – UNDERSTAND?  You guys get your s**t together please – this is ridiculous and unprofessional that we cannot get an answer."

78.     The D&O Defendants supplied information and made statements in a reckless manner to Prospect that gave the impression that they were deeply knowledgeable of the current state of Ellet's finances and had analyzed the effect of the various actions to be taken.  However, in truth their reckless acts and omissions in providing such information constituted bad faith dereliction of duty that directly harmed Prospect because they lacked reasonable diligence and inquiry to make such statements, which proved to be wildly off the mark.

ELECTRONICALLY FILED - 2019 May 23 9:42 AM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202045

79.    On the basis of Carles' and others reckless representations, on April 30, 2018, Prospect agreed to forbear from exercising its remedies and instead defer two quarters of cash interest payments in the aggregate amount of $9.5 million.

80.    The false and reckless nature of the statements and information provided by the D&O Defendants to Prospect soon became apparent.  The AcuSport Purchase was disastrous for the company.  For example, the AcuSport distribution center Ellett purchased contained only $139,000 worth of inventory.  Because there was very little actual inventory, the promised (a) 20% to 30% capture of AcuSport sales and (b) realization of a quick $7 million profit on inventory sales never had a chance of materializing.

81.    The D&O Defendants recklessly caused Ellett to use all of its remaining cash on the AcuSport Purchase, leaving it with insufficient borrowing capacity under its then-current revolving credit facility to cope with even a slight downturn in the market.  Having already stripped Ellett of all of its value and recklessly steered the company into a catastrophic financial collapse as a result of their bad faith dereliction of duty, the D&O Defendants recklessly rammed through the AcuSport Purchase which was the final nail in the coffin for Ellett and the entire enterprise.

82.    The D&O Defendants failed to take the steps necessary to consider the interests of Prospect, a party to whom they owed fiduciary duties given Ellet's state of insolvency.  Instead, the D&O Defendants caused Prospect to repeatedly delay and defer the exercise of its rights with respect to Ellett through reckless statements and the provision of incorrect information that was devoid of reasonable inquiry and diligence regarding the true state of affairs at Ellet and the impact of their acts and omissions on Prospect.  Each act of delay and forbearance by Prospect based on the D&O Defendants reckless disloyalty and breaches of fiduciary duty described herein caused

ELECTRONICALLY FILED - 2019 May 23 9:42 AM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202045

direct and particular harm to Prospect by causing it to lose the value that it otherwise would have obtained by acting promptly on sound and accurate information to protect its interests.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
**(Fraudulent Conveyance under the Statute of Elizabeth against the Transferee Defendants and Defendants John Does One through One Hundred)**

83.    Plaintiff repeats and re-alleges each of the allegations set forth above as if fully set forth herein.

84.    On September 28, 2012, Prospect loaned $100 million to the Borrowers. The proceeds of the 2012 Loan were received by Ellett, in an account held in its name in South Carolina.

85.    On or about October 1, 2012, Ellett, at the direction, and under the control, of the D&O Defendants, voluntarily distributed $134,003,871.20 to the Transferee Defendants. Ellett did not receive any consideration in exchange for the 2012 Fraudulent Conveyance.

86.    Prospect is a current creditor of Ellett and was a creditor of Ellett before Ellett made the 2012 Fraudulent Conveyance.

87.    On March 7, 2013, Prospect loaned $60 million to the Borrowers.  The proceeds of the 2013 Loan were received by Ellett, in an account held in its name in South Carolina.

88.    On or about March 7, 2013, Ellett, at the direction, and under the control, of the D&O Defendants, voluntarily distributed $54,860,549.74 to the Transferee Defendants.  Ellett did not receive any consideration in exchange for the 2013 Fraudulent Conveyance.

89.    Prospect is a current creditor of Ellett and was a creditor of Ellett before Ellett made the 2013 Fraudulent Conveyance.

90.    Upon information and belief, Wellspring IV subsequently transferred proceeds that Wellspring IV received from the Fraudulent Conveyances to John Does One through One

ELECTRONICALLY FILED - 2019 May 23 9:42 AM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202045

Hundred, each of whom was an investor in Wellspring IV or was a Wellspring Capital shareholder, officer, director, manager, executive, or partner.

91.    Ellett, along with each Borrower and Guarantor, is currently insolvent and cannot pay its debts to Prospect which, as of December 31, 2018, are due in full. Specifically, Ellett, along with each Borrower and Guarantor, has failed to retain sufficient property to satisfy its liabilities to Prospect in full.

92.    As such, pursuant to the South Carolina Statute of Elizabeth, Plaintiff may set aside the 2012 and 2013 Fraudulent Conveyances received by each Transferee Defendant, either as a direct transferee of the Fraudulent Conveyances made by Ellett or as a subsequent transferee of the Fraudulent Conveyances received by Wellspring IV, in an amount sufficient to satisfy the amounts due and owing to Prospect, currently approximately $160 million.

## SECOND CAUSE OF ACTION
### (Fraudulent Conveyance under the Statute of Elizabeth against the Transferee Defendants and Defendants John Does One through One Hundred)

93.    Plaintiff repeats and re-alleges each of the allegations set forth above as if fully set forth herein.

94.    Plaintiff alleges this cause of action in the alternative and to the extent it is determined that the Transferee Defendants did not receive the Fraudulent Conveyances directly from Ellett.

95.    On September 28, 2012, Prospect loaned $100 million to the Borrowers. The proceeds of the 2012 Loan were received by Ellett, in an account held in its name in South Carolina.

96.    On or about October 1, 2012, Ellett, at the direction, and under the control, of the D&O Defendants, voluntarily distributed $134,003,871.20 to the Transferee Defendants on behalf

ELECTRONICALLY FILED - 2019 May 23 9:42 AM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202045

of its direct and indirect parents, United Sporting and SportCo. No Borrower or Guarantor, including United Sporting, SportCo, and Ellett, received any consideration in exchange for the 2012 Fraudulent Conveyance.

97.    Prospect is a current creditor of SportCo and was a creditor of SportCo before Ellett made the 2012 Fraudulent Conveyance on SportCo's behalf.

98.    On March 7, 2013, Prospect loaned $60 million to the Borrowers. The proceeds of the 2013 Loan were received by Ellett, in an account held in its name in South Carolina.

99.    On or about March 7, 2013, Ellett, at the direction, and under the control, of the D&O Defendants, voluntarily distributed $54,860,549.74 to the Transferee Defendants on behalf of its direct and indirect parents, United Sporting and SportCo. No Borrower or Guarantor, including United Sporting, SportCo, and Ellett, received any consideration in exchange for the 2013 Fraudulent Conveyance.

100.    Prospect is a current creditor of SportCo and was a creditor of SportCo before Ellett made the 2013 Fraudulent Conveyance on SportCo's behalf.

101.    Upon information and belief, Wellspring IV subsequently transferred proceeds that Wellspring IV received from the Fraudulent Conveyances to John Does One through One Hundred, each of whom was an investor in Wellspring IV or was a Wellspring Capital shareholder, officer, director, manager, executive, or partner.

102.    SportCo, along with each Borrower and Guarantor, is currently insolvent and cannot pay its debts to Prospect which, as of December 31, 2018, are due in full. Specifically, SportCo, along with each Borrower and Guarantor, has failed to retain sufficient property to satisfy its liabilities to Prospect in full.

ELECTRONICALLY FILED - 2019 May 23 9:42 AM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202045

103.   As such, pursuant to the South Carolina Statute of Elizabeth, Plaintiff may set aside the 2012 and 2013 Fraudulent Conveyances received by each Transferee Defendant, as either an initial transferee of the Fraudulent Conveyances made by SportCo, or a subsequent transferee of the Fraudulent Conveyances received by United Sporting, SportCo, or Wellspring IV, in an amount sufficient to satisfy the amounts due and owing to Prospect, currently approximately $160 million.

**THIRD CAUSE OF ACTION**
**(Breach of Fiduciary Duty against the D&O Defendants)**

104.   Plaintiff repeats and re-alleges each of the allegations set forth above as if fully set forth herein.

105.   The D&O Defendants, in each of their capacities as managers, officers, and directors of SportCo, United Sporting, and Ellett and its subsidiaries, served as fiduciaries to each Borrower and Guarantor, including Ellett.

106.   By January 2017, Ellett was deeply insolvent.  As a result, the D&O Defendants, as fiduciaries of Ellett, United Sporting, and SportCo, owed the fiduciary duties of good faith, due care, and absolute loyalty to Prospect, Ellett's largest creditor.

107.   Upon Ellett's insolvency, the D&O Defendants failed to take the steps necessary to consider the interests of Prospect.  Instead, the D&O Defendants breached the fiduciary duties they owed to Prospect by causing Prospect to repeatedly delay and defer the exercise of its rights under the 2012 and 2013 Loan agreements through reckless statements and the provision of incorrect information that was devoid of reasonable inquiry and diligence regarding the true state of affairs at Ellett and the impact of their acts and omissions on Prospect.  For example, among other things, The D&O Defendants:

ELECTRONICALLY FILED - 2019 May 23 9:42 AM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202045

- recklessly, and without reasonable or diligent inquiry, caused Ellett to purchase unsaleable inventory to artificially inflate its borrowing base so that it could borrow more money from its revolving line of credit, which the D&O Defendants failed to disclose to Prospect when they wrongfully caused Prospect to operate under the false impression that Ellett could continue to service its debt to Prospect;

- recklessly, and without reasonable or diligent inquiry, caused Ellett to otherwise materially overstate the value of Ellett's inventory, causing significant harm to Prospect, which relied upon such information along with the D&O Defendants' other reckless communications in determining whether and when to exercise its rights;

- recklessly, and without reasonable or diligent inquiry, caused Ellett to consummate the AcuSport Purchase under false pretenses—including making false representations that the deal would allow Ellett to acquire $14 million worth of AcuSport inventory at a substantial discount; that it would result in Ellett's immediate realization of a $7 million profit on the sale of the AcuSport inventory purchased in the deal; and that it would result in Ellett capturing 20% to 30% of AcuSport sales; and

- elevated their own interests and the interests of Wellspring Capital and Wellspring IV over those of Prospect by failing to provide Prospect with accurate and truthful information concerning the enterprise's financial position and by inducing Prospect, through reckless acts and omissions, including both what they said and what they failed to say, in connection with bad faith dereliction of duty, to delay and forbear the exercise of Prospect's remedies under the 2012 and 2013 Loans.

ELECTRONICALLY FILED - 2019 May 23 9:42 AM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202045

108.    As a result of these breaches of fiduciary duty and the D&O Defendants' reckless and grossly negligent mismanagement through bad faith dereliction of duty, Prospect was induced to enter into additional financings of Ellett and amendments to Prospect's existing financings. The D&O Defendants' breaches of fiduciary duty also caused Prospect to delay and forbear (i) exercising its remedies under the 2012 and 2013 Loans and (ii) promptly moving to protect and execute on its security interests in the Borrowers.

109.    As a direct and proximate result of these breaches of the fiduciary duties of good faith, candor, due care, and absolute loyalty, Prospect suffered direct and particular harm in an amount to be proven at trial, but in any event no less than the difference between the current value of the security interests granted to it under the 2012 and 2013 Loans and the value Prospect would have received from such interests had it acted promptly and on sound and accurate information to protect these interests starting no later than 2017, plus the amount of additional financing provided to Ellett by Prospect while Ellett was insolvent.

## FOURTH CAUSE OF ACTION
### (Aiding and Abetting Breach of Fiduciary Duty against Wellspring Capital)

110.    Plaintiff repeats and re-alleges each of the allegations set forth above as if fully set forth herein.

111.    In the alternative, to the extent Wellspring Capital is deemed not to owe fiduciary duties directly to Prospect, then Wellspring Capital is liable for aiding and abetting the breach of the fiduciary duties of the other D&O Defendants set forth above, which are specifically incorporated by reference as if fully set forth herein.

112.    Wellspring Capital knowingly participated in and substantially assisted the breach of fiduciary duties committed by the D&O Defendants by controlling and directing them to do Wellspring Capital's bidding. Indeed, to the extent the D&O Defendants were Wellspring Capital

ELECTRONICALLY FILED - 2019 May 23 9:42 AM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202045

agents and employees, Wellspring Capital knew that each of the D&O Defendants owed fiduciary duties to Prospect and caused the D&O Defendants to breach those duties for its own benefit.

113.    As a direct and proximate result of Wellspring Capital's aiding and abetting, Prospect suffered damages equal to the damages set forth in the Third Cause of Action.

## FIFTH CAUSE OF ACTION
### (Negligent Misrepresentation against the D&O Defendants)

114.    Plaintiff repeats and re-alleges each of the allegations set forth above as if fully set forth herein.

115.    The D&O Defendants made numerous representations to Prospect concerning the AcuSport Purchase, including that the purchase would allow USC to acquire $14 million worth of AcuSport inventory at a substantial discount; that it would result in USC's immediate realization of a $7 million profit on the sale of the AcuSport inventory so purchased; and that it would result in USC capturing 20% to 30% of AcuSport sales.

116.    Each of these representations was both material and false at the time they were made.

117.    The D&O Defendants, including Wellspring Capital, had a substantial pecuniary interest in making these false representations, and in persuading Prospect of the merits of the AcuSport Purchase, thereby inducing Prospect to forgo exercising its bargained-for remedies in the event of an interest payment default by Ellett in the second quarter of 2018.

118.    Prospect justifiably relied on the representations made by the D&O Defendants with respect to the AcuSport Purchase in making Prospect's decisions regarding the exercise of its rights..

119.    As fiduciaries of Prospect, the D&O Defendants had a duty of candor and to exercise due care to impart truthful information to Prospect.

ELECTRONICALLY FILED - 2019 May 23 9:42 AM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202045

120.    The false representations and omissions that the D&O Defendants made concerning the AcuSport Purchase were material to Prospect and induced Prospect to (i) not exercise its bargained-for remedies in response to USC's interest payment default in the second quarter of 2018 and (ii) instead defer two quarters of cash interest payments in the aggregate amount of $9.5 million—a direct and particular harm to Prospect.

121.    The D&O Defendants also caused Ellett to materially overstate to Prospect the value of USC's inventory on its books and records. The D&O Defendants intended Prospect to rely on these misstatements, and Prospect justifiably did so rely. These misstatements caused Prospect to justifiably believe that Ellett's financial health was much better than it was, temporarily created the illusion that Ellett would not default on its interest payments, and further caused Prospect to forbear from exercising its remedies under the 2012 and 2013 Loans.

122.    As a direct and proximate result of Prospect's reasonable reliance on the false representations as set forth above, Prospect was severely and directly harmed in an amount to be proven at trial but in any event no less than the harm set forth in the Third Cause of Action.

### SIXTH CAUSE OF ACTION
#### (Constructive Trust against All Defendants)

123.    Plaintiff repeats and re-alleges each of the allegations set forth above as if fully set forth herein.

124.    During the time of the 2012 Fraudulent Conveyance, the 2013 Fraudulent Conveyance, and thereafter, the D&O Defendants caused Ellett's assets to be depleted to the point where the company was unable on December 31, 2018 to repay all of its loans from Prospect.

125.    The Transferee Defendants' conduct during and after the 2012 Fraudulent Conveyance and 2013 Fraudulent Conveyance render it inequitable for the Transferee Defendants

ELECTRONICALLY FILED - 2019 May 23 9:42 AM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202045

to retain the money they received as a result of the Fraudulent Conveyances. That money should instead be returned to Prospect.

126.    After the 2012 Fraudulent Conveyance and 2013 Fraudulent Conveyance, the D&O Defendants repeatedly misrepresented and mischaracterized to Prospect the AcuSport Purchase and engaged in grossly negligent, disloyal, and bad faith mismanagement of Ellett.

127.    The D&O Defendants induced Prospect to rely on their misrepresentations and modify Prospect's loans to the Borrowers in support of the misrepresented AcuSport Purchase.

128.    The D&O Defendants also caused Ellett to purchase unsaleable inventory to materially overstate the value of Ellett's overall inventory and artificially maintain a robust borrowing base.

129.    Wellspring Capital also stripped Ellett of additional money by causing Ellett to pay Wellspring Capital management fees from 2009 to 2017, totaling approximately $6 million.

130.    This Court should impose a constructive trust on Defendants and order Defendants to pay to Prospect the approximately $160 million that Prospect is owed under the 2012 and 2013 Loans.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in favor of Prospect as follows:

a.    On the First and Second Causes of Action against the Transferee Defendants, voiding the Fraudulent Conveyances and ordering the Transferee Defendants to pay to Prospect the amounts each Transferee Defendant received from the Fraudulent Conveyances in the aggregate amount currently due to Prospect under the 2012 and 2013 Loans—approximately $160 million;

b.　　On the Third, Fourth, and Fifth Causes of Action against one or more of the D&O

Defendants, an amount to be determined at trial that is not less than the amount of the particular

harm suffered by Prospect due to (i) the reduction in the value of its particular security interests

and (ii) the amounts of any additional financing;

c.　　The imposition of a constructive trust against all Defendants;

d.　　Punitive damages;

e.　　An award of pre- and post-judgment interest;

f.　　The costs and expenses incurred by Prospect to prosecute this action, including

attorneys' fees; and

g.　　such other relief as the Court deems just and proper.

s/ Kevin K. Bell
_____
Kevin K. Bell [S.C. Bar No. 65495]
Mary McDonald Campolong [S.C. Bar No. 102317]
ROBINSON GRAY STEPP & LAFFITTE, LLC
Post Office Box 11449
Columbia, South Carolina 29211
(803) 929-1400
kbell@robinsongray.com
mmcdonald@robinsongray.com

Counsel for Plaintiff

May 23, 2019

ELECTRONICALLY FILED - 2019 May 23 9:42 AM - LEXINGTON - COMMON PLEAS - CASE#2019CP3202045