## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| RONALD FRIEDMAN, as trustee for The SportCo Creditors' Liquidation Trust, | ) ) ) ) ) | |
| Plaintiff, | ) ) ) | Adversary No. 19-80071-dd |
| v. | ) ) ) | |
| WELLSPRING CAPITAL MANAGEMENT LLC, WELLSPRING CAPITAL PARTNERS IV, L.P., WCM GENPAR IV, L.P., WCM GENPAR IV GP, LLC, ALEXANDER E. CARLES, BRADLEY JOHNSON, F. HEWITT GRANT, CHARLES E. WALKER, JR., TODD BOEHLY, BERNARD ZIOMEK, and ANDREW KUPCHIK, | ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

## DEFENDANT TODD BOEHLY'S REPLY IN SUPPORT OF
## HIS MOTION FOR SUMMARY JUDGMENT

CHANDLER & DUDGEON LLC
J.W. Nelson Chandler
P.O. Box 547
Charleston, SC 29402
Telephone:  843-577-5410
Facsimile:  843-577-5650

WILMER CUTLER PICKERING HALE AND DORR LLP
Philip D. Anker
Thomas B. Davis
250 Greenwich Street
7 World Trade Center
New York, New York 10007
Telephone:  212-230-8800

*Attorneys for Defendant Todd Boehly*

March 2, 2023

## TABLE OF CONTENTS

**Page**

INTRODUCTION ........................................................................................................................1

ARGUMENT.............................................................................................................................2

I.      South Carolina Law Authorized the Issuance of the Dividends. .........................................2

II.     The Dividends Were Not "Voluntary" Within the Meaning of the Statute of Elizabeth. ...6

III.    The Trustee Has Not Identified a Pre-Existing Creditor Who Could Avoid the Dividends
        Under South Carolina Law. ...........................................................................................11

IV.     The Trustee's Claims Fail as a Matter of Equity. ...........................................................19

CONCLUSION.......................................................................................................................22

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Belfance v. Bushey (In re Bushey)*,
    210 B.R. 95 (B.A.P. 6th Cir. 1997)..........................................................................13, 14, 18

*Butner v. United States*,
    440 U.S. 48 (1979).........................................................................................................10

*Campbell v. Hanckel (In re Hanckel)*,
    512 B.R. 539 (Bankr. D.S.C. 2014), *aff'd, appeal dismissed*, No. 2:14-CV-
    2898, 2015 WL 7251714 (D.S.C. Mar. 10, 2015) .....................................................6

*Campbell v. Wellman (In re Wellman)*,
    No. 97-80304-W, 1998 WL 2016787 (Bankr. D.S.C. June 2, 1998) ......................18

*Capco of Summerville, Inc. v. J.H. Gayle Constr. Co.*,
    628 S.E.2d 38 (S.C. 2006) .........................................................................................3

*Faulconer v. Centra Health, Inc.*,
    808 F. App'x 148 (4th Cir. 2020) ..............................................................................9

*Giuliano v. Schnabel (In re DSI Renal Holdings, LLC)*,
    617 B.R. 496 (Bankr. D. Del. 2020) ..........................................................................7

*Kiriakides v. United Artists Commc'ns, Inc.*,
    440 S.E.2d 364 (S.C. 1994) ................................................................................16, 17

*Morgan Distrib. Co. v. Unidynamic Corp.*,
    868 F.2d 992 (8th Cir. 1989) ......................................................................................9

*Orr v. Kinderhill Corp.*,
    991 F.2d 31 (2d Cir. 1993)..........................................................................................7

*Penning v. Reid*,
    166 S.E. 139 (S.C. 1932) .........................................................................................15

*T v. T (In re S.N.T.)*,
    662 S.E.2d 413 (S.C. Ct. App. 2008)................................................................... 19-20

*Temple v. Montgomery*,
    153 S.E. 640 (S.C. 1930) ....................................................................................12, 15

*Tuller v. Nantahala Park Co.*,
    281 S.E.2d 474 (S.C. 1981) ...............................................................................19, 20, 21

**Statutes**

11 U.S.C. § 544.................................................................................................................18

11 U.S.C. § 548.................................................................................................................10

Ohio Rev. Code Ann. § 1336.04......................................................................................13

S.C. Code Ann. § 27-23-10..............................................................................................10

S.C. Code Ann. § 33-6-400.........................................................................................3, 4, 5

South Carolina Business Corporation Act of 1988 (the "Corporations Act"), .................... *passim*

**Other Authorities**

5 Collier on Bankruptcy ¶ 544.06....................................................................................18

5 Collier on Bankruptcy ¶ 548.03 (16th ed.) ....................................................................7

## INTRODUCTION

Defendant Todd Boehly submits this brief in support of his Motion for Summary Judgment ("Boehly Motion"), ECF No. 311, and in reply to the Trustee's Omnibus Response to Defendants' Motions for Summary Judgment ("Trustee's Response"), ECF No. 330.

As an initial matter, for the reasons previously discussed,[1] the law of New York, not that of South Carolina, governs the claims in this action (especially those brought by the Trustee standing in the shoes of Prospect Capital Corporation ("Prospect") and Summit Partners Credit Fund, LP ("Summit"), neither of which is based in South Carolina and both of which made their loans to the Debtors[2] pursuant to a credit agreement that specified New York as the governing law).  Mr. Boehly understands that the Court has not asked for additional briefing on the choice-of-law issue, so he will not address it further here, other than to note that the Trustee, again, concedes that if the law of New York—or, for that matter, that of "almost every other state in the nation" other than South Carolina (Trustee's Response at 13)—applies, the Trustee's claims fail because the Trustee does not allege either that the Debtors paid the dividends at issue with fraudulent intent or that, under any conceivable test, those dividends left the Debtors insolvent.  If the Court agrees that New York law controls, it can grant Mr. Boehly summary judgment on that ground alone and need go no further.

But, even if the Court concludes that South Carolina law applies, Mr. Boehly is entitled to summary judgment for four independent reasons, any one of which would be sufficient:

(i)     The dividends were issued in compliance with the statute in South Carolina governing the payment of dividends, the Corporations Act;

---

[1] *See* Defendant Todd Boehly's (A) Joinder in the Wellspring Defendants' Brief on Choice of Law and (B) Memorandum on Why the Governing State Law Precludes Plaintiff's Claims, ECF No. 276.
[2] Capitalized terms not otherwise defined herein shall have their respective meanings as set forth in the Boehly Motion.

(ii) Even if the Statute of Elizabeth, instead, provides the controlling law, the dividends were not "voluntary" within the meaning of that law (a gift for no consideration at all), because the Debtors received multiple forms of consideration in connection with their payment of the dividends;

(iii) Neither Prospect and Summit, which made their loans substantially contemporaneous with the payment of the dividends for the express purpose of funding them, nor the so-called "Trade Creditors," whose only outstanding claims against the Debtors arose years after the Debtors paid the dividends, are "pre-existing creditors" under South Carolina law; and

(iv) The Statute of Elizabeth is equitable, and there is nothing equitable about the Trustee's claims, especially standing in the shoes of Prospect and Summit, both of which knew and agreed that the Debtors would use the proceeds of their loans to pay the dividends that the Trustee now seeks to avoid for their benefit, and never sought any guarantee by the Debtors' shareholders of repayment of those loans.

On each of these points, the Trustee's Response is telling. It is long on rhetoric, accusing Mr. Boehly and the other defendants of engaging in "utter absurdity" (Trustee's Response at 9). But it is short on what matters: law and facts. No court applying South Carolina law has ever found a fraudulent transfer on facts remotely similar to those presented in this case. This Court should not be the first. As discussed below, and in Mr. Boehly's prior submissions, both the law of South Carolina and the undisputed facts are fatal to the Trustee's claims.

## ARGUMENT

## I.    South Carolina Law Authorized the Issuance of the Dividends.

Like his prior briefs, the Trustee's Response does not cite a single South Carolina case in which dividends issued in accordance with the Corporations Act were clawed back as fraudulent transfers under the Statute of Elizabeth. The reason is clear. The Corporations Act expressly authorizes a company to pay a dividend as long as doing so would not render the company insolvent. The statute thus provides:

(a)      A board of directors may authorize and the corporation may make distributions to its shareholders subject to restriction by the articles of incorporation and the limitation in subsection (c).

[ . . . ]

(c) No distribution may be made if, after giving it effect:

(1) the corporation would not be able to pay its debts as they become due in the usual course of business; or

(2) the corporation's total assets would be less than the sum of its total liabilities plus (unless the articles of incorporation permit otherwise) the amount that would be needed, if the corporation were to be dissolved at the time of the distribution, to satisfy the preferential rights upon dissolution of shareholders whose preferential rights are superior to those receiving the distribution.

S.C. Code Ann. § 33-6-400.  Thus, only if the payment of the dividend would leave the company insolvent from a cash-flow or balance-sheet standpoint is a company barred under South Carolina law from paying a dividend authorized under its articles of incorporation.  Otherwise, "the corporation may make distributions to its shareholders."  That should be the end of the matter, because the Trustee does not even claim that the dividends at issue in this case left the Debtors unable to pay their debts as they came due or with assets worth less than their liabilities.

The Trustee nevertheless maintains that he can avoid and recover such distributions under the Statute of Elizabeth.  But he does not dispute that, in South Carolina, where two statutes provide conflicting answers to the same question, the one that addresses the subject more specifically controls, especially if it was enacted more recently.  *See, e.g., Capco of Summerville, Inc. v. J.H. Gayle Constr. Co.*, 628 S.E.2d 38, 41 (S.C. 2006) ("Where there is one statute addressing an issue in general terms and another statute dealing with the identical issue in a more specific and definite manner, the more specific statute will be considered an exception to, or a qualifier of, the general statute and given such effect.").  And the Trustee also does not dispute that, here, the Corporations Act is both more specific (it addresses the payment of dividends,

specifying when they are legal and when they are not; the Statute of Elizabeth does not, addressing transfers generally) and of more recent vintage (the Corporations Act was enacted by the South Carolina legislature in 1988; the Statute of Elizabeth dates back many centuries in England before South Carolina even existed as part of the United States).

The Trustee has only two responses.  Neither is persuasive.

*First*, he again cites a single comment to the Corporations Act.  Trustee Response at 19-20.  But, as Mr. Boehly previously explained (*see* Defendant Todd Boehly's Opposition to Trustee's Motion for Summary Judgment, ECF No. 321 ("Boehly Response")), that comment undermines, rather than supports, the Trustee's argument.  In discussing the relationship between the Corporations Act and fraudulent transfer statutes, the comment states that "it was not thought necessary to make the tests of section 6.40 (Section 33-6-400) [of the Corporations Act] identical with the tests for insolvency under these various statutes."  S.C. Code Ann. § 33-6-400 cmt. 3. Inherent in that comment is the premise that, while the exacts tests for insolvency may differ slightly, a corporate dividend is lawful and cannot be later undone, whether under the Corporations Act or fraudulent transfer law, unless, applying some legal standard, the dividend left the company insolvent.  Here, the Trustee does not claim that the dividends at issue left the Debtors insolvent under any conceivable test of insolvency.  And, contrary to the Trustee's argument that the Corporations Act does "not affect creditor rights," Trustee's Response at 19, the reporter's comments make clear that the South Carolina legislature enacted the Corporations Act to address the circumstances in which a creditor may attack a dividend paid to shareholders and that the solvency requirements of the Corporations Act apply fully to such creditor claims:

> The purpose of Section 33-6-400 is to protect **creditors** and shareholders from misapplication of capital. Compared to its predecessor provisions in the former South Carolina Business Corporation Act, Section 33-6-400 is intended to broaden the acceptable basis for determining that a distribution is permitted. The

> method for making such a determination is simplified and rationalized with
> modern views of **creditor** and shareholder security.

S.C. Code Ann. § 33-6-400 (South Carolina Reporters' cmt. 1) (emphasis added).

*Second*, the Trustee tries to analogize the interplay between the Corporations Act and the Statute of Elizabeth to the relationship between a law requiring the operator of a motor vehicle to have a license and a law specifying speed limits. Trustee Response at 22. But the situations are anything but analogous. State laws requiring drivers to be licensed say nothing about whether they can exceed speed limits, just as state laws prohibiting drivers from exceeding the speed limits say nothing about whether they can drive without a license. The two laws address different subjects and operate independently of each other. Just the opposite is the case here. The Corporations Act addresses the payment of dividends, specifying when such a payment is or is not permissible, precisely the same subject that the Trustee claims the Statute of Elizabeth addresses. And, at least in the Trustee's telling, they provide exactly the opposite answer: the Corporations Act says that the payment of a dividend that does not render the company insolvent is perfectly lawful, whereas the Trustee says that creditors who years later are left unpaid can set aside such a payment even if the company was perfectly solvent when it paid the dividend. In short, under the Trustee's interpretation of the Statute of Elizabeth, the two statutes not only address exactly the same subject, but in ways that are in direct conflict with each other because they provide opposing answers to the same question: is a dividend paid by a solvent company lawful or may it be undone?

Under these circumstances, the basic rule of South Carolina law that the more specific and more modern statute controls is dispositive. As the Trustee admits, the dividends at issue in this case were authorized under the relevant provisions of the more specific, more modern law—the Corporations Act—because the Debtors were amply solvent before and after the Debtors paid

those dividends.  For this reason alone, the Trustee's claims fail as a matter of law and Mr.

Boehly is entitled to summary judgment.

## II.    The Dividends Were Not "Voluntary" Within the Meaning of the Statute of Elizabeth.

Even as to transfers governed by the Statute of Elizabeth (i.e., transfers other than

dividends), a creditor or bankruptcy trustee must show that the transfers were "voluntary" in

order to avoid them without proving that the transfers left the debtor insolvent.  The Trustee's

Response does not dispute this settled rule of South Carolina law.  Nor can or does the Trustee

take issue with the exceedingly demanding standard he must meet to show that the transfers at

issue were "voluntary"—that the Debtors received absolutely no consideration whatsoever in

connection with those transfers.  *See Campbell v. Hanckel (In re Hanckel)*, 512 B.R. 539, 549

(Bankr. D.S.C. 2014), *aff'd*, *appeal dismissed*, No. 2:14-CV-2898, 2015 WL 7251714 (D.S.C.

Mar. 10, 2015) ("Grossly inadequate consideration does not render a conveyance voluntary").

Here, the Debtors received at least two forms of consideration.  *First*, the dividends were

part of an integrated transaction under which Prospect and Summit loaned money to enable the

Debtors both to pay the dividends and to pay off independent liabilities that they owed.  The

satisfaction of those separate debts provided the Debtors with value or consideration.  *See*

Boehly Motion at 11-12; Boehly Response at 4-6.  *Second*, the payment of the dividends

themselves satisfied valid liabilities of the Debtors.  Under applicable state law, a company

becomes legally obligated to pay a dividend once it declares the dividend, so the payment of

these dividends satisfied the Debtors' debt obligation to its shareholders.  *See* Boehly Motion at

10-11; Boehly Response at 6-7.  The Trustee's responses on both points, either one of which is

enough to defeat the Trustee's claims and entitle Mr. Boehly to summary judgment, are

unavailing.

_Integrated Transaction._  The Trustee concedes that the Debtors used a substantial portion (at least $37 million) of the proceeds they obtained from Prospect and Summit to "repay[] . . . then-existing loans." Trustee's Response at 11.  But, without citing a single case, from South Carolina or anywhere else, the Trustee baldly asserts that "[t]he dividends cannot be 'collapsed' into the loan repayments and treated as one in the same." *Id.*  That the Trustee cannot find any legal authority to support his argument is not surprising; there is ample law to the contrary. Numerous cases hold that, for fraudulent conveyance purposes, a transfer should not be viewed in isolation, but rather in the broader context of the overall transaction. *See, e.g., Orr v. Kinderhill Corp.*, 991 F.2d 31, 35 (2d Cir. 1993) ("[W]e will not turn a blind eye to the reality that the transfer of the New York Property and the spin-off of KIC shares constituted a single, integrated transaction."); *Giuliano v. Schnabel (In re DSI Renal Holdings, LLC)*, 617 B.R. 496, 504-05 & n.36 (Bankr. D. Del. 2020) ("[T]he collapsing doctrine allows courts to infer facts, intent, and notice gleaned from one part of a transaction into another to, among other things, 'slice through complicated transactions to compare what value the debtor gave and what value the debtor got.'") (quoting 5 Collier on Bankruptcy ¶ 548.03[6], at 548-57 (16th ed.)).

To be sure, Mr. Boehly has not located a South Carolina case so holding.  But the Trustee has located no case—from South Carolina or any other state—to the contrary, and there is no reason to think that South Carolina would reject this settled law from around the country when South Carolina itself has adopted the position that, so long as the debtor received any consideration at all, no matter how modest, the transfer is not voluntary and cannot be avoided if the transfer did not render the debtor insolvent.

Here, the dividends were funded through the very same loans from Prospect and Summit that also funded the repayment of the Debtors' other debts.  This was no accident.  The loan

agreement expressly provided that the Debtors would use the loan proceeds for both purposes.
*See* Boehly Motion at 15 (citing Exs. C, D).   In short, this was an integrated transaction, in
which the Debtors received consideration by obtaining tens of millions of dollars to repay their
pre-existing debts.  That alone means the transfers were not voluntary, entitling Mr. Boehly to
summary judgment.

 *Payment of the Dividends.*  The Trustee does not dispute that, under the law of both South
Carolina and Delaware (SportCo, the parent of the Debtors, was a Delaware company), a
company that declares a dividend becomes legally obligated to pay that dividend to its
shareholders.  Thus, once the Debtors declared the dividends at issue in this case—and the
Trustee does not dispute that the Debtors did so before paying those dividends—the Debtors
were required to pay them.  The payments thus satisfied the Debtors' legal obligation, providing
the Debtors with another form of value.  For this reason, too, the payment of the dividends was
not voluntary.

 The Trustee argues, however, that he can avoid the declaration of the dividends itself
(and not merely their payment).  *See* Trustee's Response at 8-10.  He also claims that, even if he
cannot avoid the declaration of the dividends, that would only mean that the payment of the
dividends was in exchange for consideration provided to SportCo, the ultimate parent whose
stock Mr. Boehly and the other shareholders owned; the Trustee argues that Ellett, a subsidiary,
not SportCo, the parent, paid the dividends and that it had no legal obligation to pay a dividend,
not to its shareholder (SportCo), but to that shareholder's shareholders (Mr. Boehly and the other
defendants).  *Id.* at 10-11.  These arguments fail both procedurally and substantively.

 As a matter of *procedure*, the arguments are entirely new.  In his complaint, the Trustee
nowhere asserts a claim to avoid the declaration (as distinguished from the payment) of the

dividends.  Nor does the complaint assert that, even if SportCo received consideration for the

payment of the dividend to its shareholders, Ellett did not because those shareholders owned the

stock of SportCo, not of Ellett.

The Trustee cannot use a brief submitted in opposition to Mr. Boehly's and the other

defendants' motions for summary judgment to rewrite his complaint.  *See, e.g.*, *Morgan Distrib.*

*Co. v. Unidynamic Corp.*, 868 F.2d 992, 995 (8th Cir. 1989) ("[I]t is axiomatic that a complaint

may not be amended by the briefs.").  And it is far too late now for the Trustee to amend (again)

the complaint itself.  The Trustee's ability to freely amend by rule or scheduling order has long

since passed, and, with discovery closed and summary judgment briefing almost complete, any

amendment to the complaint at this stage would be prejudicial to the defendants.  *See, e.g.,*

*Faulconer v. Centra Health, Inc.*, 808 F. App'x 148, 154 (4th Cir. 2020) (rejecting new theory

introduced at summary judgment because "allowing such a constructive amendment at summary

judgment may unfairly prejudice the defendant, by depriving it of the notice it needs to conduct

effective discovery").  If the Trustee had asserted these new legal theories from the start, Mr.

Boehly and the other defendants could have sought discovery regarding the relationship between

SportCo and its shareholders and developed evidence that SportCo obtained value from the

declaration of the dividend, since it needed the shareholders' continued support.  The defendants

likewise could have sought discovery on the relationship between SportCo and Ellett and

developed evidence that Ellett, like SportCo, obtained value from the payment of the dividends

because it was dependent on the financial support of SportCo, its parent, and, in turn, of

SportCo's shareholders.  But discovery has been completed, and the Trustee cannot now

completely revise his theories of the case.

The Trustee's new arguments are also unavailing as a matter of *substance*.  For one thing, the section of the Statute of Elizabeth that the Trustee cites provides a cause of action to avoid a "transfer[] and conveyance" of property.  *See* S.C. Code Ann. § 27-23-10(A).  Unlike Section 548 of the Bankruptcy Code, it does not provide a cause of action to avoid the incurrence of an "obligation," and the declaring of a dividend is just that—it causes a company to incur an obligation, but not to transfer any property (only the payment of the dividend transfers the debtor's property, its cash).

In any event, a corporation's shareholders do provide consideration for their shares and the rights flowing therefrom, including the right to obtain dividends, by providing the company with capital.  Accordingly, under applicable state law, a dividend, once declared, is a valid obligation of the company, no different from, and no more avoidable than, any other debt of the company.  Indeed, it is settled law that, in federal bankruptcy proceedings, like these, the debt obligations of the company are, except in unusual circumstances, determined by state law.  *See Butner v. United States*, 440 U.S. 48, 55 (1979) ("Property interests are created and defined by state law. Unless some federal interest requires a different result, there is no reason why such interests should be analyzed differently simply because an interested party is involved in a bankruptcy proceeding.").  Thus, no matter how much the Trustee seeks to disparage the notion that the Debtors owed a legally enforceable obligation to pay the dividends and the satisfaction of that obligation provide the Debtors with value, the law is firmly to the contrary.

On this basis, as well, the Trustee's claims fail and Mr. Boehly is entitled to summary judgment.

### III.     The Trustee Has Not Identified a Pre-Existing Creditor Who Could Avoid the Dividends Under South Carolina Law.

On this issue, like the others, the Trustee cannot and does not dispute the controlling legal principle: Under South Carolina law, even as the Trustee envisions it, only a creditor whose unpaid claim against the debtor arose before the transaction at issue can avoid the transfer as a fraudulent conveyance and that is true even if the transfer was truly "voluntary."  The Trustee continues to assert that he has identified two sets of such creditors: (1) Prospect and Summit, and (2) various trade creditors.  Neither qualifies.

_Prospect and Summit._  The Trustee's argument is, to say the least, hyper-technical.  He argues that Prospect and Summit must have disbursed the funds they loaned before the Debtors used a portion of those proceeds to pay the dividends and that is all that is necessary for them to have been "pre-existing" creditors.  The record shows that, in fact, Prospect and Summit disbursed the loan proceeds either the same day, or, at most, one business day before, the Debtors used those proceeds to pay the dividends. *See* Boehly Motion at 15, n.5.  But even more importantly than the virtually simultaneous timing, Prospect and Summit knew full well when they made their loans that the Debtors were going immediately to use the proceeds, in part, to pay the dividends.  Indeed, Prospect and Summit not only agreed that the Debtors could use the proceeds to make the transfers—the loan agreements so specified—but it was Prospect's brainchild to make the loans for this very purpose.  As discussed below, on a wholly unsolicited basis, it contacted Wellspring to offer to make the loans so that the Debtors could pay the dividends to Wellspring and the other shareholders, including Mr. Boehly.  *See id*. at 15.  Thus, as a matter of substance, the loan and the dividends were part of a single, integrated, contemporaneous transaction.  Prospect and Summit are not "pre-existing creditors," because their claims arose simultaneously with, and not before, the payment of the dividends.

11

The Trustee not only disregards the substance of the loans, but he also fails to engage on the statutory purpose behind the Statute of Elizabeth.  Why does that law distinguish between creditors whose unpaid claims arose before the debtor made the transfer at issue, and those who did not?  As the South Carolina Supreme Court has made clear for nearly 100 years, the reason is because a truly pre-existing creditor—one who made its loan not only before the debtor made the voluntary transfer, but with no knowledge, let alone consent, that the debtor would use the proceeds to fund the transfer for no consideration—is, by definition, innocent; it made its loan without any inkling that the debtor would give away its property, and it had no role at all in the debtor's subsequent decision to make the transfer and receive nothing in return.  Unlike a creditor that makes its loan for the very purpose of funding the debtor's supposed "gift," such a blameless creditor should not be prejudiced.  *See Temple v. Montgomery*, 153 S.E. 640, 647 (S.C. 1930) ("The law will not permit one who is indebted at the time to give his property away, provided [that] such gift proves prejudicial to the interest of existing creditors").  That rationale has no relevance in a case like this one where the lenders made their loans knowing, agreeing and, indeed, requesting that the Debtors use the proceeds, immediately, to pay the dividends.  Thus, neither the case law nor the legislature's intent supports the Trustee's argument that Prospect and Summit could avoid the dividends without showing that they left the Debtors insolvent.

_The Trade Creditors._  The Trustee stretches even further in his arguments regarding the Trade Creditors.  The Trustee admits, as he must, that whatever sums of money the Trade Creditors may now be owed by the Debtors arose long after the Debtors paid the Dividends.  *See* Trustee's Response at 8 ("the debts owed to the Trade Creditors and the Town of Chapin at the time of the [dividends] were fully paid prior to the petition date").  But, according to the Trustee,

the Trade Creditors nevertheless have outstanding claims that pre-existed the payment of those dividends because they have been providing services or goods to the Debtors for years, dating back to even before the Debtors issued the 2012 and 2013 dividends, and they were owed some amount when the dividends were issued.  That the Debtors repaid that pre-existing amount in full long ago, the Trustee says, does not mean the Trade Creditors have no pre-existing claim under the Trustee's "open account" theory, which he contends justifies treating a trade creditor with a continually open account as a "pre-existing creditor" at all times during the existence of the account, regardless of whether the debtor paid in full all sums that were outstanding at the time of the challenged transfer and the only sums now owing to the creditor arose long thereafter.

Not surprisingly, the Trustee is unable to cite any decision of any court, applying the law of South Carolina, adopting this entirely counter-intuitive notion.  The Trustee instead cites a case decided by the Bankruptcy Appellate Panel in the Sixth Circuit.  *See* Trustee's Response at 6 n.9 (citing *Belfance v. Bushey (In re Bushey)*, 210 B.R. 95, 102 (B.A.P. 6th Cir. 1997)).  But that case turned on the law of Ohio, not South Carolina.  *Bushey*, 210 B.R. at 101 ("Equating the fluctuating balance on an open account that passes through zero to the creation of a 'new debt' reads into **Ohio fraudulent conveyance law** an 'exception' to the 'existing' creditor concept that has not been adopted by any reported **Ohio** decision.") (emphasis added).  And, critically, the court's analysis concerned whether a creditor on an open account had standing to avoid a transfer under a provision of the Ohio fraudulent transfer statute that permits the avoidance of a transfer only if, at the time of the transfer, the debtor "is or will be thereby rendered insolvent." *Id.* at 101 (quoting Ohio Rev. Code Ann. § 1336.04) ("Every conveyance made . . . by a person who is or will be thereby rendered insolvent is fraudulent as to creditors . . . if the conveyance is made . . .  without fair consideration").  That requirement places a reasonable limitation on the

"open account" theory, as the account creditor can still only challenge transfers that leave the debtor insolvent or occur while the debtor is already insolvent.  Nothing in *Bushey* remotely suggests that the courts in Ohio, let alone those in South Carolina, would allow a creditor whose only outstanding claim arose after, not before, the challenged transfer to avoid that transfer under a legal regime that, at least as the Trustee construes South Carolina law, does not require any showing that the transfer left the debtor insolvent.

That the Trustee bases his entire argument on the law of a different state, with an entirely different fraudulent transfer law than the one he claims exists in South Carolina, is all the more telling, because the Trustee himself criticizes Mr. Boehly and the other defendants for supposedly relying "on the law of other states with materially different statutory regimes." Trustee's Response at 3.  That criticism is unwarranted—Mr. Boehly and other defendants have cited numerous South Carolina cases in support of their defenses—but the underlying premise that out-of-state case law, such as *Bushey*, that turns on very different statutes are inapposite is exactly right.

Admitting that no South Carolina case actually supports his argument, the Trustee asserts that "[t]here is no reason that the South Carolina Supreme Court would reach a contrary result" to that in *Bushey*.  Trustee's Response at 7.  There are, in fact, multiple reasons.  As discussed, the basic structure of fraudulent transfer law in South Carolina, if the Trustee is to be believed, is fundamentally different from that in Ohio and just about every other state in the nation. Moreover, the Trustee's claim that the Trade Creditors have pre-existing claims is inconsistent with South Carolina law in at least three other respects.

*First*, the South Carolina cases that have addressed what it means to be a "pre-existing" creditor under this state's law have strongly intimated that the creditor's outstanding claim must

be for the same amounts that were outstanding at the time of the challenged transfer.  *See, e.g., Temple*, 153 S.E. at 647 ("The law will not permit one who *is indebted at the time* to give his property away, provided such gift proves prejudicial to the interest of existing creditors. . . . If the donor *is indebted at the time*, and the event proves that it is necessary to resort to the property attempted to be conveyed away by a voluntary deed for the purpose of paying *such indebtedness*, the voluntary conveyance will be set aside and the property subjected to the payment of *such indebtedness*.") (emphasis added); *Penning v. Reid*, 166 S.E. 139, 148 (S.C. 1932) ("[O]ne who is in debt[] cannot make a voluntary conveyance, which will prevail against *existing debts*"; "if *in the final event* the property of the debtor is not sufficient to pay *his debts existing at the time of his voluntary conveyance*, then such conveyance is null and void *as to such debts*.") (first, third and fourth emphasis added).

*Second*, the South Carolina legislature's decision to give greater protection to a pre-existing creditor makes sense only if "pre-existing" means that the creditor has an unpaid claim against the debtor for goods or services it provided before the debtor made the challenged transfer, and not that the creditor has an outstanding claim for goods and services it provided long thereafter.  The only difference between a creditor that extended credit to the debtor before the debtor made the challenged transfer and a creditor that did so after the debtor made the challenge is that the former, unlike the latter, could not have known that the debtor would make the transfer when it decided to extend credit to the debtor.  That distinction may provide a basis for giving a pre-existing creditor, but not a subsequent creditor, the right to avoid a transfer without proving that the transfer left the debtor insolvent, but only if the creditor's unpaid claim truly arose before the transfer, not if it extended some credit then, but it was fully repaid all such amounts by the debtor and, after the transfer occurred, it continued to extend credit to the debtor.

15

*Third*, the Supreme Court of this state has cautioned that South Carolina statutes should not be construed to produce a result that would be "so plainly absurd that it could not possibly have been intended by the Legislature." *Kiriakides v. United Artists Commc'ns, Inc.*, 440 S.E.2d 364, 366 (S.C. 1994). The Trustee's reading of the Statute of Elizabeth, applied to its logical extreme, could easily lead to outcomes that, if not truly "absurd," the legislature could not conceivably have intended. The following two hypotheticals, neither of which is remotely far-fetched, illustrates the point:

> Hypothetical One. Sixty years ago, in 1963, a newlywed couple in their 20s gets married and buys a home in Columbia, South Carolina. As homeowners, they obtain water, gas, and electricity and therefore begin "open accounts" with the local utility companies. Two years later, in 1965, they have a child, and then they have a second one, two years thereafter, in 1967. Wanting to provide a foundation for their children to go to college some day or otherwise to have a head start on life, they make a gift of $500 to each child, when he or she is born, in a bank account they open in the child's name. At the time of the gifts, the couple owes the water, gas and electric company for the prior month's utility services. The couple pays those bills in full, on time, and it continues to do so for many decades as it remains in the same house. But, nearly 60 years later, the couple, now elderly, falls on hard times and cannot pay its utility bills for services rendered in January 2023. Under the Trustee's theory, the water, gas and electric companies can sue the two children to avoid the gifts they received back in 1965 and 1967 even though their parents were perfectly solvent at the time and even though the couple repaid whatever amounts they owed the utility companies at the time. That the only outstanding sums owed those companies did not arise until 2023 does not matter, in the Trustee's telling. The utility companies are still somehow "pre-existing" creditors with respect to transfers that occurred back in 1965 and 1967. And there is no statute of limitations bar to the claim because, according to the Trustee, the limitations period would not begin to run until the utility providers are not paid for the services they rendered in January 2023. *See* Pl.'s Mot. to Strike at 11-15, ECF No. 204.

> Hypothetical Two. Duke Energy is one of the largest companies operating in both North and South Carolina. One of its predecessor entities, Carolina Power & Light ("CP&L"), began operations in 1908[3] and became a public company 40 years later, in 1948.[4] Imagine that it, like many utility companies, paid regular

---

[3] *See*
https://en.wikipedia.org/wiki/Carolina_Power_%26_Light_Company#:~:text=Known%20locally%20as%20%22CP%26L%22%20the,area%20of%20western%20North%20Carolina.
[4] *See* https://www.referenceforbusiness.com/history2/62/Carolina-Power-Light-Company.html.

quarterly dividends to its shareholders, beginning when it became a public company.  CP&L had offices (and Duke Energy continues to have offices) in South Carolina.  As a result, it has had open accounts with utility providers, and local governments/taxing authorities, since it began paying dividends in 1948.  Imagine that, as has happened with other major utilities (e.g., Pacific Gas & Electric), some natural disaster or crisis occurs and Duke Energy is forced into bankruptcy.  Under the Trustee's theory of the case, the bankruptcy trustee can invoke South Carolina law and seek to avoid every dividend paid by Duke Energy and its predecessor CP&L since 1948, even though Duke Energy and CP&L were perfectly solvent at the time they paid the dividends, historically paid all their bills on time (including those to their counter-parties on the open accounts), and only experienced financial difficulties recently.  Nevertheless, if the Trustee is right and the utility providers or local governments/taxing authorities are owed any amount as of 2023, they constitute creditors with claims that "pre-existed" the dividend payments dating back to 1948.

The Trustee's argument that the Trade Creditors in the present case have claims that "pre-exist" the 2012 and 2013 dividends, even though the only amounts they are owed arose years later, is no different from the argument by the utility provider and bankruptcy trustee in these hypotheticals.  The Court can conclude for itself if it truly believes that the South Carolina legislature intended to permit the claims in the hypotheticals—claims that would make buying a home and raising a family, or operating a business, in South Carolina substantially less attractive than doing so in the rest of the nation.  But if it concludes that the South Carolina legislature could not have intended such a bizarre and counterproductive (for the economy of South Carolina and the well-being of its citizens) result, then it should reject the conceptually identical claim in this case, applying the South Carolina Supreme Court's admonition from *Kiriakides*.

 For all these reasons, the Trustee's theory that the Trade Creditors have claims that "pre-existed" the Debtors' payment of the dividends in 2012 and 2013 fails under the law of this state.  Perhaps recognizing as much, the Trustee does an about-face and argues that, even if outside bankruptcy the Trade Creditors could not seek to avoid the dividends under the law of South Carolina, the Trustee can do so under federal law, the Bankruptcy Code.  *See* Trustee's Response at 7-8.  That is simply wrong.

The Bankruptcy Code does impose its own independent standing requirement on a trustee who wants to assert an avoidance claim, but that requirement is in addition to, not in lieu of, those imposed by state law.  The very Sixth Circuit B.A.P. case that the Trustee cites, *Bushey*, makes this clear.  *See Bushey*, 210 B.R. at 100-101 (a bankruptcy trustee suing under Section 544(b) of the Bankruptcy Code, "'stands in the shoes' of the [triggering] creditor, subject to any defenses that could be asserted against the creditor"; "Section 544(b) imposes only one 'standing' requirement that is independent of the state law cause of action asserted by the trustee: the creditor must hold an allowable unsecured claim, determined under the allowance rules of the Bankruptcy Code").  By its very terms, Section 544(b) permits a trustee to avoid a transfer only if that transfer "is voidable under applicable law by a creditor holding an unsecured claim."  11 U.S.C. § 544(b).  If the transfer would not be "voidable under applicable law" by the supposed triggering creditor under state law outside bankruptcy, then that creditor has no rights to offer a trustee under § 544(b).  *See Campbell v. Wellman (In re Wellman)*, No. 97-80304-W, 1998 WL 2016787, at *3 (Bankr. D.S.C. June 2, 1998) ("Pursuant to § 544(b), the Trustee must also demonstrate that Robert McKittrick was an actual unsecured creditor who had a viable claim under the applicable state limitations period to bring the Statute of Elizabeth cause of action."); *see also* 5 Collier on Bankruptcy ¶ 544.06[3] ("Section 544(b)(1) confers upon the trustee no greater rights of avoidance than the actual creditor would have if that creditor were asserting invalidity on its own behalf.").

Thus, if the Trade Creditors could not avoid the dividends under state law—and, for the reasons discussed, they could not—the Trustee cannot either.  This fatal flaw in the Trustee's claims provides yet another ground on which Mr. Boehly is entitled to summary judgment.

**IV.    The Trustee's Claims Fail as a Matter of Equity.**

The Trustee no longer appears to blink reality—i.e., in his last brief, the Trustee appears

finally to acknowledge that in South Carolina fraudulent transfer is an equitable cause of action

that is subject to the basic rules of equity.  That seeming concession is understandable.  The

South Carolina Supreme Court has made clear in *this very case* that actions brought under the

Statute of Elizabeth sound in equity.  *See* Order from the Supreme Court of South Carolina 1 n.1,

ECF No. 154.  Indeed, it has previously rejected fraudulent transfers claims brought under that

law where it found that sustaining them "would not be equitable."  *Tuller v. Nantahala Park Co.*,

281 S.E.2d 474, 477 (S.C. 1981).

But, while the Trustee pays lip service to the South Carolina Supreme Court's holdings

that his claims sound in equity and that a plaintiff is entitled to relief on such claims only if that

relief would be equitable, he does just that—he merely pays lip service to these principles.  He,

again, argues that a fraudulent transfer is void, and not merely voidable, in South Carolina, and

therefore no equitable defenses can apply.  *See* Trustee's Response at 13-14.  But, as shown in

prior briefing, the notion that a fraudulent transfer may be void in South Carolina simply speaks

to the consequence *if* the Trustee can establish all the elements of his claims and defeat all the

defenses thereto; it does not relieve the Trustee from the burden of establishing that equity

supports the relief he seeks, any more than it relieves him of the need to prove that his claim is

timely.  *See* Boehly Motion at 22-23.  In South Carolina, as in every other jurisdiction with

courts of equity, if an action sounds in equity, "the court may consider equitable defenses such as

laches, unclean hands, and whether an adequate legal remedy exists."  *T v. T (In re S.N.T.)*, 662

S.E.2d 413, 417 (S.C. Ct. App. 2008).  Fraudulent transfer claims are no exception, as the South

Carolina Supreme Court's decision in *Tuller* makes clear.

The Trustee's other arguments are just as unavailing.  He casts various aspersions at Wellspring.  *See* Trustee's Response at 3, 15, 24-25.  But, even if Wellspring did anything inequitable (and Mr. Boehly has no reason to believe that), Wellspring has settled.  Mr. Boehly is not Wellspring.  The Trustee does not point to a shred of evidence that Mr. Boehly or, for that matter, any of the other remaining individual defendants, was anything other than a passive investor who provided capital to the Debtors in exchange for stock in the company; there is literally no evidence that Mr. Boehly or the other individual defendants played any role at all in causing Prospect and Summit to make the loans or in causing the Debtors to pay the dividends with the proceeds.

The contrast to Prospect and Summit is palpable.  The Trustee acknowledges that, when they made their loans, Prospect and Summit knew full well that the Debtors would use the proceeds, in part, to fund the dividends.  But, setting up a strawman to be knocked down, the Trustee acts as if Prospect and Summit simply happened, by coincidence, to know this and had no active involvement in the transaction at issue.  Far from it.  Prospect and Summit expressly agreed that the Debtors could use the proceeds for this purpose.  Indeed, the record establishes that Prospect contacted Wellspring in the first instance to propose that it make loans to companies like the Debtors in which Wellspring had invested to permit those companies to pay dividends to Wellspring and the companies' other shareholders.  *See* Boehly Motion at 15.  And Summit's own witness admitted under oath that it could have asked the Debtors' shareholders to guarantee repayment of the loans—effectively, the relief the Trustee now seeks standing in Prospect's and Summit's shoes—but it did not want to do that because, if the shareholders would have agreed to provide such a guarantee at all, the interest rate on the loans payable to Prospect and Summit would have decreased markedly.  *See* Boehly Motion at 16, 23-24.  Prospect and

Summit decided not to seek what would have been a perfectly adequate legal remedy—a written guarantee of repayment of their loans by the shareholders—because they preferred to take greater risk in the hope of earning a greater financial return.

In short, Prospect, joined by Summit, was the mastermind behind the whole transaction. For their own economic reasons, Prospect and Summit assumed the risk that the Debtors would become insolvent and unable to pay back the loans in full. *See Tuller*, 281 S.E2d at 478 (rejecting, as inequitable, fraudulent transfer claim by creditor that chose, by contract, the collateral for its loan and assumed the risk that it would be inadequate; "Having selected its collateral, the banks may not now be heard to invoke the highly technical and economically disastrous results of the law of fraudulent conveyances without first having assiduously observed all of the prerequisites to such relief.").

According to the Trustee, "[e]quitable principles do not exist in a vacuum" and "[c]ontext is required to make determinations of whether an outcome is just and fair." Trustee's Response at 13. Exactly. The "context" here is that the principal creditors on whose behalf the Trustee sues and whose rights he asserts actively solicited the loans, directed that the Debtors use the proceeds to pay the dividends, and consciously decided not to obtain shareholder guarantees. Prospect and Summit were anything but hapless victims left, as the Trustee puts it, "high and dry," Trustee's Response at 23; they were sophisticated financial firms whose appetites for high-risk, high-reward loans were the very genesis of the transfers at issue.

Simply put, to use the colloquial expression, Prospect and Summit made their bed, and they now need to sleep in it. It would be the antithesis of equity to allow the Trustee acting in their stead to invoke the equitable cause of action of fraudulent transfer to unwind the dividends, as if Prospect and Summit had somehow been defrauded.

## CONCLUSION

For these reasons, as well as those set forth in the Boehly Motion and Boehly Response,

Mr. Boehly respectfully requests that the Court grant the Boehly Motion (and deny the Trustee's

Cross-Motion).

Respectfully submitted,

CHANDLER & DUDGEON LLC

/s/J.W. Nelson Chandler
J.W. Nelson Chandler, Fed. ID. No. 7593
Email:  nelson@chandlerdudgeon.com
P.O. Box 547
Charleston, SC 29402
Telephone:  843-577-5410
Facsimile:  843-577-5650

and

WILMER CUTLER PICKERING HALE AND
DORR LLP
Philip D. Anker, Esq. (admitted *pro hac vice*)
Email:  philip.anker@wilmerhale.com
Thomas Davis, Esq. (admitted *pro hac vice*)
Email:  thomas.davis@wilmerhale.com
250 Greenwich Street
7 World Trade Center
New York, New York 10007
Telephone:  212-230-8800
Facsimile:  212-230-8888

*Attorneys for Defendant Todd Boehly*

March 2, 2023

**UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF SOUTH CAROLINA**

| | | |
|---|---|---|
| RONALD FRIEDMAN, as trustee for The SportCo Creditors' Liquidation Trust, | ) ) ) ) ) | |
| | ) | Adversary No. 19-80071-dd |
| Plaintiff, | ) ) ) | |
| v. | ) ) | |
| WELLSPRING CAPITAL MANAGEMENT LLC, WELLSPRING CAPITAL PARTNERS IV, L.P., WCM GENPAR IV, L.P., WCM GENPAR IV GP, LLC, ALEXANDER E. CARLES, BRADLEY JOHNSON, F. HEWITT GRANT, CHARLES E. WALKER, JR., TODD BOEHLY, BERNARD ZIOMEK, and ANDREW KUPCHIK, | ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that **DEFENDANT TODD BOEHLY'S REPLY IN SUPPORT OF HIS MOTION FOR SUMMARY JUDGMENT** was served upon following counsel of record for all parties via the ECF/CM system of the United States Bankruptcy Court for the District of South Carolina, on March 2, 2023, as addressed below:

Joshua Justin Bruckerhoff on behalf of Plaintiff Ronald J Friedman
jbruckerhoff@rctlegal.com

Gregory Schwegmann on behalf of Plaintiff Ronald J. Friedman
gschwegmann@rctlegal.com

William Tyler Perry on behalf of Plaintiff Ronald J Friedman
tperry@rctlegal.com

R. William Metzger, Jr. on behalf of Plaintiff Ronald J Friedman
bmetzger@robinsongray.com

Marcus A. Manos on behalf of Defendants WCM Genpar IV GP, LLC; WCM Genpar
IV, L.P.; Wellspring Capital Management, LLC; Wellspring Capital Partners IV, L.P.
mmanos@nexsenpruet.com

Julio E. Mendoza, Jr. on behalf of Defendants WCM Genpar IV GP, LLC; WCM Genpar
IV, L.P.; Wellspring Capital Management, LLC; Wellspring Capital Partners IV, L.P.
rmendoza@nexsenpruet.com

Lisa P. Sumner on behalf of Defendants WCM Genpar IV GP, LLC, WCM Genpar IV,
L.P., Wellspring Capital Management, LLC, Wellspring Capital Partners IV, L.P.
lsumner@nexsenpruet.com

Susan P. McWilliams on behalf of Defendants WCM Genpar IV GP, LLC, WCM Genpar
IV, L.P., Wellspring Capital Management, LLC, Wellspring Capital Partners IV, L.P.
smcwilliams@nexsenpruet.com

W. Harrison Penn on behalf of Defendants WCM Genpar IV GP, LLC, WCM Genpar IV,
L.P., Wellspring Capital Management, LLC, Wellspring Capital Partners IV, L.P.
hpenn@mccarthy-lawfirm.com

G. William McCarthy, Jr. on behalf of Defendants WCM Genpar IV GP, LLC, WCM
Genpar IV, L.P., Wellspring Capital Management, LLC, Wellspring Capital Partners IV,
L.P.; bmccarthy@mccarthy-lawfirm.com

Shaun C Blake on behalf of Defendants Andrew Kupchik; Charles E. Walker, Jr.
sblake@rogerslewis.com

Mary M. Caskey on behalf of Defendant F. Hewitt Grant
mcaskey@hsblawfirm.com

/s/J.W. Nelson Chandler
CHANDLER & DUDGEON LLC
J.W. Nelson Chandler, Fed. ID No. 7593
Email: nelson@chandlerdudgeon.com
P.O. Box 547
Charleston, SC 29402
Telephone: 843-577-5410
Facsimile: 843-577-5650

*Attorneys for Defendant Todd Boehly*