## UNITED STATES BANKRUPTCY COURT
### DISTRICT OF SOUTH CAROLINA

| | |
|---|---|
| Ronald J. Friedman, as the trustee for the SportCo Creditors' Liquidation Trust,<br><br>Plaintiff,<br><br>v.<br><br>Wellspring Capital Management, LLC, Wellspring Capital Partners IV, L.P., WCM Genpar IV, L.P., WCM Genpar IV GP, LLC, Alexander E. Carles, Bradley Johnson, F. Hewitt Grant, Charles E. Walker, Jr., Todd Boehly, Bernard Ziomek, and Andrew Kupchik,<br><br>Defendants. | Adv. Pro. No.: 19-80071-hb<br><br><br><br><br>**ORDER** |

**THIS MATTER** came before the Court for trial of causes of action against the remaining Defendants.   R. William Metzger, Jr., Joshua J. Bruckerhoff, and Gregory S. Schwegmann appeared on behalf of Plaintiff Ronald J. Friedman, as the trustee for the SportCo Creditors' Liquidation Trust.   Appearing on behalf of the Defendants remaining in this action were: J.W. Nelson Chandler, Philip D. Anker, and Thomas Davis on behalf of Defendant Todd Boehly; Shaun C. Blake on behalf of Defendants Charles E. Walker, Jr. and Andrew Kupchik; and Mary M. Caskey on behalf of Defendant F. Hewitt Grant.   The parties stipulated to facts, which are restated verbatim below in the Findings of Fact section.[1]   No live testimony was offered at trial, and joint exhibits 1 – 48 were admitted, including declarations and excerpts from deposition transcripts.

---

[1] ECF No. 352.

1

Plaintiff consents to the Bankruptcy Court's entry of final orders and judgment in this adversary proceeding,[2] while the other parties to this proceeding do not.[3]

After a careful review of the record and applicable law, the Court enters findings of fact and conclusions of law as follows.[4]

### FINDINGS OF FACT

#### The Parties

1.      The plaintiff in this Adversary Proceeding, Ronald Friedman, is the trustee of the SportCo Creditors Liquidation Trust (the "Trustee" or "Plaintiff"), a trust created under the plan of liquidation (the "Plan") confirmed by the U.S. Bankruptcy Court for the District of Delaware (the "Delaware Bankruptcy Court") on November 6, 2019, for the following debtor entities (collectively, the "Debtors"): SportCo Holdings, Inc. ("SportCo"); its wholly-owned subsidiary United Sporting Co. ("USC"); USC's wholly-owned subsidiary Ellett Brothers, LLC ("Ellett"); and various subsidiaries of Ellett – Bonitz Brothers, Inc.; Evans Sports, Inc.; Jerry's Sports, Inc.; Outdoor Sports Headquarters, Inc.; Quality Boxes, Inc.; and Simmons Guns Specialties, Inc.

2.      The remaining defendants in this Adversary Proceeding are all natural persons: Todd Boehly, F. Hewitt Grant, Andrew Kupchik, and Charles E. Walker, Jr. (collectively,

---

[2] ECF No. 178.

[3] "Defendants assert[ed] that if the claims [were] found to be core claims, the Bankruptcy Court does not have constitutional authority to enter final judgment" in the Adversary Proceeding Report filed March 5, 2021. (ECF No. 169).

[4] *See* Standing Order Concerning Title 11 Proceedings Referred Under Local Civil Rule 83.IX.01, Referral to Bankruptcy Judges.

> If a bankruptcy judge or district judge determines that entry of a final order or judgment by a bankruptcy judge would not be consistent with Article III of the United States Constitution in a particular proceeding referred under Local Civil Rule 83.IX.01 and determined to be a core matter, the bankruptcy judge shall, unless otherwise ordered by the district court, hear the proceeding and submit proposed findings of fact and conclusions of law to the district court.  The district court may treat any order of the bankruptcy court as proposed findings of fact and conclusions of law in the event that the district court concludes that the bankruptcy judge could not have entered a final order or judgment consistent with Article III of the United States Constitution.

"Defendants").  Defendants were all minority shareholders in SportCo at the time SportCo paid the dividends at issue in the Adversary Proceeding.

3.    Prior to the Debtors' bankruptcy, Prospect Capital Corporation ("Prospect") initiated this litigation by filing a complaint in South Carolina state court on May 23, 2019, naming as defendants certain of SportCo's directors and officers and certain of SportCo's shareholders, including Defendants, and asserting causes of action for fraudulent conveyance, breach of fiduciary duty, negligent misrepresentation, and imposition of a constructive trust.  Shortly thereafter, the Debtors filed for bankruptcy in the U.S. Bankruptcy Court for the District of Delaware (the "Delaware Bankruptcy Court") and the action became subject to the automatic stay. The Delaware Bankruptcy Court lifted the automatic stay for the limited purpose of permitting the action to be removed to this Court.  Subsequently, the Trustee was substituted for Prospect as the named plaintiff.  The Trustee then filed an amended complaint asserting causes of action under sections 544(b) and 550 of the Bankruptcy Code and (as against parties other than the Defendants) negligent misrepresentation.  This Court dismissed the negligent misrepresentation claims, and the Trustee filed the now-operative Second Amended Complaint (the "Amended Complaint"), which asserts causes of action only for fraudulent conveyance.  Along with the remaining Defendants, the Amended Complaint named Wellspring IV and other affiliates of Wellspring (as defined below) as defendants, but the claims against those parties have been settled and dismissed.

<u>The Debtors</u>

4.    The Debtors had their principal place of business in South Carolina, and their predecessors' operations date back to 1933.  Ellett, a South Carolina limited liability company, was founded on November 2, 2006, upon the dissolution of Ellett Brothers, Inc.

5.      In 2008, Wellspring Capital Partners IV, L.P. ("Wellspring IV"), an investment fund managed by Wellspring Capital Partners, LLC ("Wellspring"), acquired Ellett.  Wellspring IV formed SportCo, a Delaware corporation, as a holding company to own USC, another Delaware corporation, which in turn owned 100% of Ellett.

6.      Throughout their history, Ellett and the other Debtors were marketers and distributors of a broad line of products and accessories for hunting and shooting sports, and for marine, camping, archery, and other outdoor activities.  The products included firearms, reloading and ammunition, leather goods, camping equipment, sportsman gifts, and a variety of other outdoor sporting goods.  The Debtors carried the major brands in the outdoor sports industry, including Remington, Ruger, Browning, Winchester, Smith & Wesson, Glock, Bushnell, Sig Sauer, Springfield Armory, Hornaday, Henry, Magpul, Armscor, MotorGuide, Minn Kota, Lowrance, Federal, CCI, Taurus, and Leupold.  By the later years of their operations, the Debtors' customer base consisted of 20,000 independent retailers covering all 50 states.

7.      As set forth in this Court's Opinion dated May 12, 2023 [Dkt. No. 344], the Debtors "achieved high sales and revenues and had significant operations until sometime in 2016, when [their] profits began to decrease."  In 2012, for instance, the Debtors' revenues were approximately $1.2 billion.

<u>The Transactions Giving Rise to the Trustee's Claims</u>

8.      Wellspring IV became by far the largest shareholder of the Debtors in 2008 when, as described above, it acquired Ellett.  As part of that transaction, in addition to making an equity investment, Wellspring IV extended an $18 million secured loan at a 20% interest rate to SportCo, subordinated to the existing asset-based lending ("ABL") group of Bank of America, Regions

Bank, and Wells Fargo Bank (the "ABL Lenders").  Ellett and its subsidiaries were also liable for this loan.  Defendants were not involved in this financing in any capacity.

9.      In 2009, Wellspring IV invested an additional $27.4 million in SportCo and loaned another $17 million in subordinated, secured debt at a 20% interest rate to SportCo, to finance the Debtors' acquisition of Jerry's Sports, Inc.  Ellett and its subsidiaries were also liable for this loan. Defendants were not involved in this financing in any capacity.

10.      The dividends that the Trustee seeks to avoid and recover in this Adversary Proceeding were paid in 2012 and 2013 to the shareholders of SportCo.

11.      The transactions at issue in this Adversary Proceeding were financed by secured loans from Prospect, a publicly traded business development corporation that makes debt and equity investments in middle market business across a range of industries, and from Summit Partners Credit Fund, LP, Summit Partners Credit Fund A-1, L.P., Summit Investors I, LLC, and Summit Investors I (UK), L.P. (collectively, "Summit"), subsidiaries of Summit Partners, an investment firm that, through its credit division, invests in growth capital, recapitalizations, acquisitions and leveraged buyouts, distressed situations/debtor-in-possession financings and rescue financings for middle-market companies.

The 2012 Financing and Dividend

12.      On September 28, 2012, Prospect and Summit (together, the "Second Lien Lenders") entered into a Second Lien Loan And Security Agreement (the "Second Lien Loan Agreement") with Ellett, Evans Sports, Inc., Jerry's Sports, Inc., Simmons Gun Specialties, Inc., Bonitz Brothers, Inc., Outdoor Sports Headquarters, Inc. (the "Borrower Debtors") for a $170 million dollar loan that would be used to fund a one-time dividend to SportCo's shareholders (the

"2012 Dividend"), to pay down certain pre-existing debt of the Borrower Debtors, and to pay associated costs and fees to the Second Lien Lenders.

13.      The discussions that led to the Second Lien Loan Agreement were initiated by Geoffrey Chang of Prospect on or around May 25, 2012, by email, to Alex Carles of Wellspring.

14.      In his email, Mr. Chang wrote that he had joined Prospect and that it had substantial capital to lend to companies in which a Wellspring fund, such as Wellspring IV, was a large investor, including for the purpose of enabling the company to pay a dividend to its shareholders. Mr. Chang described Prospect as a "$2.5 billion platform where we are industry agnostic, commit quickly, and can speak to any potential financing from senior secured unitranche to 2nd liens and mezzanine, and invest up to $200 million per deal."

15.      By the summer of 2012, Prospect was engaged in active discussions with Wellspring and the Debtors about a second lien secured loan to be provided by Prospect to the Debtors, to be used in significant part by the Debtors to pay a dividend to Wellspring and the other SportCo shareholders.

16.      Prospect agreed, early in the negotiations, that one of the purposes of the loan would be to permit the Debtors to fund dividend payments to SportCo's shareholders.  For instance, in an email dated July 20, 2012, Mr. Chang accepted a meeting proposed by Mr. Carles to discuss what Mr. Chang described as a "dividend recap for USC."

17.      In an email dated July 31, 2012, Mr. Chang followed up with Mr. Carles about a term sheet for financing that Prospect had previously sent Wellspring.  In that email, Mr. Chang told Mr. Carles that "If there is anything else [Prospect] can do to provide further assurance that we are serious about speaking to the entire junior capital financing on these terms, please do not hesitate to let me know.  Alternatively, I can get the President of [Prospect], Grier Eliasek, together

with myself, on the phone to speak with the Board of Directors and reassure them in regards to our genuine interest and commitment to be supportive of you in this potential transaction."

18.     In August 2012, Mr. Chang wrote to Mr. Carles asking "[i]s there anything we can do to help further our cause as it relates to potentially leading the USC 2nd lien deal?", and later, stating that "[w]e will do whatever we have to do to support you on this deal."

19.     On August 8, 2012, Grier Eliasek, Prospect's President and Chief Operating Officer, wrote to Mr. Chang: "Go hard for the $140M deal leading.  I like this one a lot."

20.     As part of the negotiations, Summit joined as a co-lender with Prospect, and the dollar amount of the proposed financing increased from $140 million to $170 million.

21.     The Second Lien Lenders, Wellspring, and the Debtors completed the negotiations in September and entered into the Second Lien Loan Agreement on September 28, 2012.

22.     Under the Second Lien Loan Agreement, the Second Lien Lenders were granted liens on the assets of the Borrower Debtors.  The parties also executed an intercreditor and subordination agreement (the "Intercreditor and Subordination Agreement"), under which the Second Lien Lenders agreed to subordinate their liens and rights to those of the ABL Lenders; a written guaranty agreement (the "Guaranty Agreement"), under which SportCo, as the Parent Guarantor, agreed to guarantee the obligations of its subsidiaries, the Borrower Debtors, to the Second Lien Lenders, and granted liens to secure those obligations, and a stock purchase agreement (the "Stock Purchase Agreement"), under which Summit acquired stock in SportCo, and became a shareholder along with Wellspring IV and Defendants.

23.     As memorialized in a corresponding Sources and Uses and Flow of Funds memorandum (the "2012 Sources and Uses"), the Second Lien Loan Agreement provided for the Second Lien Lenders to loan the Borrower Debtors a total of $170,000,000, with Prospect

providing $100,000,000 and Summit providing $70,000,000.  The Second Lien Loan Agreement

specified that the loan proceeds would be available to the Debtors "solely" to pay a dividend to

the Debtors' shareholders in an amount up to $134,500,000 and to repay a portion of the

outstanding second lien debt owed by SportCo (for which Ellett and its subsidiaries were also

liable) to Wellspring in the amount of $34,791,000.  Specifically, the Second Lien Loan Agreement

contained the following provision:

> Use of Proceeds.  Proceeds of the Term Loans shall be used by Borrowers solely
> for one or more of the following purposes: (i) to make a one-time Distribution to
> Holdings (for further Distribution to SportCo) to repay a portion of the Wellspring
> Debt on the Closing Date; (ii) to pay the Closing Date Distribution on the Closing
> Date, and (iii) to pay the fees and transaction expenses associated with the closing
> of the Transactions described herein.  In no event may any Term Loan proceeds be
> used by Borrowers to make a contribution to the equity of any Subsidiary which is
> not a Borrower, to purchase or to carry, or to reduce, retire or refinance any Debt
> incurred to purchase or carry any Margin Stock or for any related purpose that
> violates the provisions of Regulations T, U or X of the Board of Governors.

The Closing Date Distribution was defined as "the one-time cash Distribution by Borrowers to

Holdings (for further distribution to SportCo and Wellspring and the other shareholders of

SportCo) on the Closing Date in an amount up to $134,500,000, which Distribution shall be

excluded from all calculations of the Consolidated Fixed Charge Coverage Ratio."

24.    The Second Lien Loan Agreement further provided for the loans to accrue interest

at the rate per annum equal to the greater of the LIBOR rate plus 11% and 12.75%, and for Prospect

and Summit to be paid an upfront fee of $2,250,000 and $1,575,000, respectively.

25.    The Second Lien Lenders received additional rights and benefits as lenders under

the Second Lien Loan Agreement, including board observation rights as to the Debtors, audit

rights, access to financial information about the Debtors, and covenants limiting the incurrence of

additional debt and distributions by the Debtors.

26.     The Second Lien Loan Agreement contained a section on governing law that provided, prior to an amendment (discussed below) that the agreement "shall be governed by and construed in accordance with the laws of the State of New York."

27.     Under the terms of the Second Lien Loan Agreement, the Second Lien Lenders' obligation to provide the $170,000,000 in financing was conditioned on their receipt of "evidence satisfactory to them . . . that, after giving effect to [the financing and its use to pay a dividend that] each Borrower [would remain] Solvent."

28.     As noted, the Second Lien Lenders sought and obtained a guarantee by SportCo of the Borrower Debtors' obligations under the Second Lien Loan Agreement.  The Second Lien Lenders did not, however, request or receive contractual guarantees from SportCo's shareholders for the Borrower Debtors' obligations under the Second Lien Loan Agreement.

29.     In a deposition taken in this Adversary Proceeding, James Freeland, a representative of Summit who participated in negotiating the Second Lien Loan Agreement, testified that, on deals on which he worked, it was not normally part of Summit's practice to request that equity owners provide a guaranty for the loans and that "[i]f [Summit] got guarantees from equity sponsors [the interest rate on the] loans would be . . . 2 percent . . . ."

30.     On Friday, September 28, 2012, USC, as the sole member of Ellett, signed a written consent approving a resolution authorizing Ellett to enter into the, inter alia, the Second Lien Loan Agreement and to perform its obligations thereunder.  On September 26, 2012, via a Unanimous Written Consent, the board of directors of USC approved payment of a cash dividend to SportCo of $169,500,000 payable on or prior to November 27, 2012.  On September 28, 2012, via a Unanimous Written Consent, the board of directors of SportCo declared a cash dividend of up to $134,500,000 to its shareholders payable on or prior to November 27, 2012.

31.     On the following business day, Monday, October 1, 2012, pursuant to the Second Lien Loan Agreement, the Second Lien Lenders collectively loaned $170 million to Ellett.

32.     On October 1, 2012, Defendants received the following transfers from the proceeds of the Second Lien Loan Agreement: $130,024,072.35 to Wellspring IV; $1,967,081.28 to Todd Boehly; $1,180,248.77 to Andrew Kupchik; $667,430.68 to F. Hewitt Grant; and $66,684.06 to Charles E. Walker, Jr.  The total amount of these transfers was $133,905,517.14.  These amounts were remitted from a bank account held in the name of Ellett.

33.     Mr. Boehly was a passive minority investor in SportCo.  Messrs. Grant, Kupchik and Walker had been employees of the Debtors who became minority shareholders through stock compensation and stock purchases during their employment.  At the time of the 2012 Dividend, Mr. Boehly owned 1.47% of SportCo's equity, Mr. Grant owned 0.5%, Mr. Kupchik owned 0.88%, and Mr. Walker owned 0.05%.  Defendants played no role in the negotiations that led to the Loan Agreement or the payment of the 2012 Dividend.

34.     In accordance with the terms of the Second Lien Loan Agreement, Ellett used the remainder of the loan proceeds—approximately $34,791,100—to repay a portion of the outstanding secured debt owing to Wellspring IV, and to pay the Second Lien Lenders various fees and reimburse their transactional costs incurred in connection with the loan.

35.     In their resolutions declaring and authorizing the payment of the 2012 Dividend executed on or before September 28, 2012, the board of directors of each of USC and SportCo found that the "fair saleable value of the Corporation's assets exceeds the value of its liabilities, including all contingent and other liabilities, by an amount that is greater than the capital of the Corporation" and "after giving effect to the payment of the Dividend, the aggregate value of the Corporation's assets will exceed the sum of its liabilities and capital."  In this Adversary

Proceeding, the Trustee does not dispute this finding, or otherwise contend that the Debtors paid

the 2012 Dividend with actual intent to hinder, delay or defraud any of their creditors. The Trustee

also does not contend that at the time of the 2012 Dividend the Debtors were "insolvent . . . or

became insolvent as a result of such transfer or obligation," were "engaged in business or a

transaction, or [were] about to engage in business or a transaction, for which any property

remaining with the debtor was an unreasonably small capital" or "intended to incur, or believed

that [they] would incur, debts that would be beyond [their] ability to pay as such debts matured,"

as those terms are used in the context of section 548(a)(1)(B) [of] the Bankruptcy Code and similar

state fraudulent transfers, including those modeled after the Uniform Fraudulent Transfer Act.

<u>The 2013 Financing and Dividend</u>

36.     In January 2013, Prospect reached out to Wellspring to offer additional financing

for the purpose of another dividend.

37.     On January 24, 2013, Mr. Chang emailed Mr. Carles to say that "[Prospect] would

strongly consider making additional 2nd lien issuance to fund another dividend." Mr. Chang also

asked if "there are any other deals in [Wellspring's] portfolio that we can do a dividend recap or

refi of," advising that Prospect would "pursue aggressively."

38.     On March 7, 2013, the Second Lien Lenders, along with the Borrowers, executed

the First Amendment and Limited Consent to the Second-lien Loan Agreement (the "2013 Loan

Amendment") whereby Prospect loaned the Borrowers an additional $60 million to fund an

additional dividend (the "2013 Dividend").

39.     The 2013 Loan Amendment contained the following provision amending the "Use

of Proceeds" section of the Second Lien Loan Agreement:

> Proceeds of the Closing Date Term Loan shall be used by Borrowers solely for one
> or more of the following purposes: (i) to make a one-time Distribution to Holdings

(for further Distribution to SportCo) to repay a portion of the Wellspring Debt on the Closing Date; (ii) to pay the [2012 Dividend] on the Closing Date, and (iii) to pay the fees and transaction expenses associated with the closing of the Transactions described herein.  Proceeds of the Incremental Term Loan shall be used solely (a) to pay the [2013 Dividend] on the Incremental Term Loan Funding Date and (b) to pay the fees and transaction expenses in connection with the Incremental Term Loan.  In no event may any Term Loan proceeds be used by Borrowers to make a contribution to the equity of any Subsidiary which is not a Borrower, to purchase or to carry, or to reduce, retire or refinance any Debt incurred to purchase or carry any Margin Stock or for any related purpose that violates the provisions of Regulations T, U or X of the Board of Governors.

40.     Because the 2013 financing was structured as an amendment to the Second Lien Loan Agreement, Prospect and Summit, as the Second Lien Lenders, maintained the same liens, rights and protections, and the 2013 financing earned the same interest rate, as Prospect and Summit had for the 2012 financing.  Under the 2013 Loan Amendment, Prospect and Summit also were paid an upfront fee of $1,350,000 and $700,000, respectively.

41.     The 2013 Loan Amendment specified that the law of New York would govern the rights and obligations of the parties thereunder and that agreement would be construed and [interpreted] in accordance with New York law.  In an email dated September 29, 2014, in relation to a draft of a further amendment of the Second Lien Loan Agreement, Seb Cervinka of Prospect told Drew Edwards of USC that under Prospect's "protocols . . . the governing law of the loan document must be New York, and the Borrower's submission to New York court jurisdiction must be exclusive," and provided draft language to that effect.

42.     Under the terms of the 2013 Loan Amendment, Prospect's obligation to provide the additional $60 million in financing was conditioned on its receipt of "evidence satisfactory to them . . . that, after giving effect to [the additional financing and its use to pay a dividend that] each Borrower [would remain] Solvent."

43.     As had been true the year before, SportCo guaranteed the obligations of the Borrower Debtors under the 2013 Loan Amendment, but Prospect did not condition its obligation

to provide the financing on the agreement of[5] to provide, or otherwise ever requested that any of SportCo's shareholders provide. a contractual guarantee of repayment of the additional $60 million in financing provided by them.

44.    The additional $60 million in financing closed on March 7, 2013.  On that date, satisfied that the Borrower Defendants[6] remained solvent, Prospect funded the additional $60 million in loan proceeds.

45.    On the same day, March 7, 2013, the boards of directors of each of Ellett, USC and SportCo declared and authorized the payment of dividends to be paid using most of the proceeds of the 2013 additional financing.  Specifically, the sole member of Ellett approved the Amendment and thereby authorized a distribution to USC of up to $60,000,000; the board of directors of USC approved payment of a cash dividend to SportCo of $60,000,000; and the board of directors of SportCo declared a cash dividend of up to $60,000,000 to its shareholders.

46.    The Debtors' boards did so (a) after finding that the "fair saleable value of the Corporation's assets exceeds the value of its liabilities, including all contingent and other liabilities, by an amount that is greater than the capital of the Corporation" and "after giving effect to the payment of the Dividend, the aggregate value of the Corporation's assets will exceed the sum of its liabilities and capital, and (b) after receiving an opinion from the valuation firm of Houlihan Lokey Financial Advisors, Inc. ("Houlihan"), dated March 6, 2013, which confirmed that the incurrence of the debt for the money borrowed to pay the 2013 Dividend, and the payment of that dividend, would leave USC solvent.

---

[5] Based on paragraph 22 of the stipulated facts and the context, it appears the word "SportCo" is missing.
[6] While "Borrower Debtors" is a defined term that seems to be intended here, "Borrower Defendants" is not, so this appears to be an error.

47.    In this Adversary Proceeding, the Trustee does not dispute this finding or opinion, or otherwise contend that the Debtors paid the 2013 Dividend with actual intent to hinder, delay or defraud any of their creditors, or that at the time of the 2013 Dividend the Debtors were "insolvent . . . or became insolvent as a result of such transfer or obligation," were "engaged in business or a transaction, or [were] about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital" or "intended to incur, or believed that [they] would incur, debts that would be beyond [their] ability to pay as such debts matured," as those terms are used in the context of section 548(a)(1)(B) or the Bankruptcy Code and similar state fraudulent transfers, including those modeled after the Uniform Fraudulent Transfer Act.

48.    On March 7, 2013, Defendants received the following transfers out of the proceeds of the 2013 Loan Amendment: $53,145,394.59 to Wellspring IV; $847,743.75 to Mr. Boehly; $287,639.45 to Mr. Grant; $508,646.25 to Mr. Kupchik; and $28,738.51 to Mr. Walker.   In addition, Summit and some of its affiliates, as shareholders of SportCo, received $2,890,467.07. These transfers were remitted from a bank account held in the name of Ellett.

49.    Defendants played no role in the negotiations that led to the 2013 Loan Amendment or the payment of the 2013 Dividend.

### Subsequent Events and this Litigation

50.    The Debtors remained solvent, and paid their bills as they came due, for years after they paid the 2012 and 2013 Dividends.  In 2015, Ellett was the fifth largest private company in South Carolina and the largest distributor of firearms in the United States, with annual revenues of $750 million, over 350 employees nationwide, and 175 employees in South Carolina.

51.    Sometime after 2015, the Debtors began to experience financial difficulties.

52.    On December 31, 2018, the Debtors defaulted on the Second Lien Loan Agreement.

53.    As noted, on May 23, 2019, Prospect filed this action in the Circuit Court for Lexington County, South Carolina, seeking to avoid portions of the 2012 and 2013 Dividends and to obtain additional relief against parties that no longer remain defendants in the case. Prospect named as defendants Wellspring and certain of its affiliates, Defendants, and certain other individuals associated with the Debtors or Wellspring. Prospect did not name Summit as a defendant, however, even though it was a shareholder of SportCo at the time of the 2013 Dividend and, as noted, received more than $2.8 million as part of the payment of that dividend. Before filing the state court action, Prospect asked Summit whether Summit wanted to join as another plaintiff but, as Adam Britt, a Managing Director of Summit, testified in deposition in this Adversary Proceeding, Summit declined to do so.

54.    On June 10, 2019 (the "Petition Date"), the Debtors filed Chapter 11 petitions in the Delaware Bankruptcy Court. The Debtors' cases were joined for joint administration under Case No. 19-11299 (LSS) in the Delaware Bankruptcy Court.

55.    On September 6, 2019, Wellspring and its affiliates, which were at the time defendants, removed the litigation from state court to this Court.

56.    On November 6, 2019, the Delaware Bankruptcy Court confirmed the Plan for the Debtors. Under that Plan, the Trustee became the trustee of a liquidating trust for the benefit of the Debtors' creditors, including Prospect, Summit, and the Debtors' general unsecured creditors. On January 10, 2020, the Trustee was substituted for Prospect as the plaintiff in this Adversary Proceeding.

57.    The Plan provided for limited substantive consolidation of the Debtors "for the purposes of [the Plan], including voting on [the Plan] by the Holders of Claims and making any Distributions to Holders of Claims."  The Plan did not separately classify creditors against any of the Debtors, instead placing all unsecured creditors of the Debtors in the same class and entitling all to the same ratable distributions.  Among other reasons for this limited substantive consolidation, the Plan provided that "Prior to the Petition Date, the Prepetition Term Loan Lenders extended credit to the Debtors as consolidated entities."

58.    On April 21, 2021, after this Court entered an order dismissing all but the fraudulent transfer claims, the Trustee filed an amended complaint, which is now the operative complaint in this Adversary Proceeding (the "Amended Complaint").  In the Amended Complaint, the Trustee asserts fraudulent transfer claims under Section 544(b) of the Bankruptcy Code against Defendants seeking to avoid and recover the payment of those portions of the 2012 and 2013 Dividends that Defendants received.  In asserting those claims, the Trustee has identified three sets of what he claims were "pre-existing" creditors that he argues could have brought suit on the Petition Date and, under the law of South Carolina, could have avoided the payment of those dividends to Defendants: (1) Prospect and Summit, and (2) the Trade Creditors, and (3) the Town of Chapin, South Carolina.

<u>Prospect and Summit</u>

59.    Though Summit received a portion of the 2013 Dividend, it was released from claims arising therefrom in the Plan, and was not named as a defendant in any of the complaints in this litigation.

60.    As for Prospect and Summit, neither were creditors of any of the Debtors prior to their entry into the Second Lien Loan Agreement.  Neither had ever extended credit to or otherwise done business with any of the Debtors prior to September 2012.

61.    At the time of those loan transactions and the payment of the associated 2012 and 2013 Dividends, neither Prospect nor Summit had any presence in South Carolina.  Prospect was and is headquartered in New York, New York, and Summit was and is headquartered in Boston, Massachusetts.  According to its website, Prospect is "a leading publicly-traded Business Development Company ("BDC")" that makes "debt and equity investments in U.S. middle market businesses across a range of industries, and seek[s] to deliver steady, attractive returns to our shareholders."  https://www.prospectstreet.com/corporate-profile/default.aspx.  Summit is part of Summit Partners which, according to its website, has "broad and deep industry expertise" and "for more than 35 years" has been "helping companies accelerate their growth." https://www.summitpartners.com/.

62.    Prospect and Summit are the Debtors' largest creditors, and will receive the bulk of any recovery the Trustee may obtain in this Adversary Proceeding.  Under the Plan, Prospect (and Summit to the extent that it has agreed to fund the litigation) will receive 38% of the litigation proceeds, with the remaining 62% of the litigation proceeds to be split between Prospect and Summit, as "the Prepetition Term Loan Lenders" (entitled to 85% of the remainder), on the one hand, and the holders of General Unsecured Claims (entitled to 15% of the remainder), on the other.

63.    The Debtors' Plan grants Prospect "sole discretion over the conduct of the litigation of" the causes of action at issue here, "including but not limited to with respect to the choice and funding of counsel and expenses."

## The Trade Creditors of Ellett, and the Town of Chapin

64.     Garmin USA, Inc. ("Garmin"), Vista Outdoor Sales, LLC ("Vista") on behalf of its corporate affiliates Federal Cartridge Company ("Federal") and Bushnell Holdings, Inc. ("Bushnell"), Navico Inc. ("Navico"), Remington Arms Company, LLC ("Remington"), and Leupold & Stevens, Inc. ("Leupold") are hereinafter referred to, collectively, as the "Trade Creditors."

65.     The Trade Creditors provided goods to Ellett on credit and had outstanding claims for ordinary course accounts payable against Ellett at the time the Debtors paid the 2012 and/or 2013 Dividends.  Those claims did not arise out of the funding provided by Prospect and Summit to enable the Debtors to pay those dividends.  However, after they issued the 2012 and 2013 Dividends, the Debtors paid those claims in full in the ordinary course.

66.     Thereafter, for several years, the Trade Creditors continued to extend trade credit in the ordinary course, and the Debtors continued to pay any outstanding accounts payable in the ordinary course.

67.     In particular, Garmin provided goods to Ellett on credit between September 30, 2012, and June 10, 2019 (the "Petition Date").  As of October 1, 2012, Ellett owed money to Garmin for goods provided on credit.  As of March 7, 2013, Ellett owed money to Garmin for goods provided on credit.  The amounts owed as of October 1, 2012, and March 7, 2013, to Garmin were paid in full by Ellett well prior to the Petition Date.

68.     Federal, Bushnell, and, later, Vista, on behalf of Federal and Bushnell as the sales and marketing division for Federal and Bushnell, provided goods to Ellett on credit between at least September 30, 2012 and the Petition Date.  As of October 1, 2012, Ellett owed at least $75,000.00 to Federal for goods provided on credit.  As of October 1, 2012, Ellett owed at least

$450,000.00 to Bushnell for goods provided on credit.  As of March 7, 2013, Ellett owed at least $1,400,000.00 to Federal for goods provided on credit.  As of March 7, 2013, Ellett owed at least $80,000.00 to Bushnell for goods provided on credit.  The amounts owed as of October 1, 2012, and March 7, 2013, to Federal and Bushnell were paid in full by Ellett well prior to the Petition Date.

69.     Navico provided goods to Ellett on credit between at least September 30, 2012 and the Petition Date.  As of October 1, 2012, Ellett owed at least $733,000.00 to Navico for goods provided on credit.  As of March 7, 2013, Ellett owed at least $499,000.00 to Navico for goods provided on credit.  The amounts owed as of October 1, 2012, and March 7, 2013, to Navico were paid in full by Ellett well prior to the Petition Date.

70.     Remington provided goods to Ellett on credit between at least September 30, 2012 and the Petition Date.  As of October 1, 2012, Ellett owed at least $260,000.00 to Remington for goods provided on credit.  As of March 7, 2013, Ellett owed at least $5,100,000.00 to Remington for goods provided on credit.  The amounts owed as of October 1, 2012, and March 7, 2013, to Remington were paid in full by Ellett well prior to the Petition Date.

71.     Leupold provided goods to Ellett on credit between at least September 30, 2012 and the Petition Date.  As of October 1, 2012, Ellett owed at least $10,000.00 to Leupold for goods provided on credit.  As of March 7, 2013, Ellett owed at least $160,000.00 to Leupold for goods provided on credit.  The amounts owed as of October 1, 2012, and March 7, 2013, to Leupold were paid in full by Ellett well prior to the Petition Date.

72.     A yearly Town of Chapin business license is required to conduct business in Chapin, South Carolina.  Between March 7, 2013, and the Petition Date, Town of Chapin business licenses were effective for each respective calendar year, January 1 to December 31.  As of March 7, 2013,

Ellett owed at least $320,000.00 to the Town of Chapin for a business license for the year 2013. The amount owed as of March 7, 2013, to the Town of Chapin for that license was paid in full by Ellett well prior to the Petition Date. Ellett did not owe the Town of Chapin any amount at the time of the 2012 Dividend, as Ellett had already paid the license fee for that year. Between March 7, 2013, and the Petition Date, Ellett operated on Town of Chapin business licenses for all or portions of each year. Ellett operated its business in Chapin for the entirety of the calendar years 2013, 2014, 2015, 2016, 2017, 2018, and part of the 2019 calendar year. Ellett paid in full, as and when due, for the business licenses for all years until 2019.

73.     The Trade Creditors each maintained different principal places of business. Garmin's principal place of business was in Kansas between October 1, 2012, and the Petition Date. Vista's principal place of business was in Minnesota between 2014 and the Petition Date, and Federal's principal place of business also was in Minnesota between 2012 and the Petition Date. Navico's principal place of business was in Oklahoma between October 1, 2012, and the Petition Date. Remington's principal place of business was in North Carolina between October 1, 2012, and the Petition Date. Leupold's principal place of business was in Oregon between March 1, 2013 and the Petition Date. The Town of Chapin's principal place of business was in South Carolina between October 1, 2012, and the Petition Date.

74.     All amounts owed by any of the Debtors to the Trade Creditors as of the Petition Date were for goods or services provided by the Trade Creditors (and, in the case of the Town of Chapin, a license for a time period) years after the Debtors paid the 2012 and 2013 Dividends that the Trustee seeks to avoid in this Adversary Proceeding.

75.     As of the Petition Date, Ellett owed Garmin $1,226,032.35 (Claim # 222, $1,226,032.35) based on invoices from Sept. 2017 to May 2019.

76.     As of the Petition Date, Ellett owed Vista, acting on behalf of Federal, $1,125,850.32 (Claim # 309, $1,125,850.32) based on invoices from 2018.

77.     As of the Petition Date, Ellett owed Vista, acting on behalf of Bushnell, $592,018.99 (Claim # 310 $592,018.99) based on invoices from 2018.

78.     As of the Petition Date, Ellett owed Navico $1,692,971.81 (Claim # 13, $1,692,971.81) based on invoices from 2018 and 2019.

79.     As of the Petition Date, Ellett owed Remington $273,307.83 (Claim # 264, $273,307.83) based on invoices from 2018 and 2019.

80.      As of the Petition Date, Ellett owed Leupold $840,673.55 based on invoices from 2019 (Claim # 2, $840,673.55).

81.     As of the Petition Date, Ellett owed the Town of Chapin $249,000.09 for a business license for 2019 (Claim # 454, $249,000.09).

82.     The Plan states that as of the Petition Date, the Second Lien Lenders were owed approximately $249,800,405 by the Debtors.

## APPLICABLE AUTHORITIES & CONCLUSIONS OF LAW

### I.      11 U.S.C. § 544(B) AND THE SOUTH CAROLINA STATUTE OF ELIZABETH

Section 544(b)(1) of the Bankruptcy Code provides, in relevant part, that "the trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502 of this title".  11 U.S.C. § 544(b)(1).  This Court, in an opinion issued by Judge David R. Duncan,[7] held that the law applicable to Plaintiff's avoidance claims under 11 U.S.C. §

---

[7] This adversary proceeding was assigned to the undersigned on May 31, 2023, upon Judge Duncan's retirement.

544(b) is S.C. Code Ann. § 27-23-10, commonly known as the Statute of Elizabeth.[8]  The Statute

of Elizabeth provides:

> Every gift, grant, alienation, bargain, transfer, and conveyance of lands, tenements,
> or hereditaments, goods and chattels or any of them, or of any lease, rent, commons,
> or other profit or charge out of the same, by writing or otherwise, and every bond,
> suit, judgment, and execution which may be had or made to or for any intent or
> purpose to delay, hinder, or defraud creditors and others of their just and lawful
> actions, suits, debts, accounts, damages, penalties, and forfeitures must be deemed
> and taken (only as against that person or persons, his or their heirs, successors,
> executors, administrators and assigns, and every one of them whose actions, suits,
> debts, accounts, damages, penalties, and forfeitures by guileful, covinous, or
> fraudulent devices and practices are, must, or might be in any ways disturbed,
> hindered, delayed, or defrauded) to be clearly and utterly void, frustrate and of no
> effect, any pretense, color, feigned consideration, expressing of use, or any other
> matter or thing to the contrary notwithstanding.

S.C. Code Ann. § 27-23-10(A).  Under § 544, in a bankruptcy case, a trustee may "'step into the

shoes' of creditors and assert their rights under the Statute of Elizabeth, provided there is a 'creditor

with a valid unsecured claim in the bankruptcy case who could assert a claim to avoid the

transfer.'"  *In re Hanckel*, 512 B.R. 539, 546 (Bankr. D.S.C. 2014) (quoting *Hovis v. Ducate (In*

*re Ducate)*, 369 B.R. 251, 258 (Bankr. D.S.C. 2007)).  "The trustee's power to set aside transfers

is for the benefit of all creditors." *Id.* (citing *Moore v. Bay*, 284 U.S. 4, 52 S. Ct. 3 (1931)).

"Under the Statute of Elizabeth, existing creditors may avoid transfers under an actual

fraudulent transfer theory or under a constructive fraud theory."  *In re Genesis Press, Inc*., 559

B.R. 445, 453 (Bankr. D.S.C. 2016) (citing *In re J.R. Deans Co., Inc*., 249 B.R. 121, 130 (Bankr.

D.S.C. 2000)).  Under a constructive fraud theory, which Plaintiff is pursuing, a plaintiff is not

required to prove actual intent to defraud creditors.  *Id*. (citing cases).  Instead, the plaintiff must

prove the transfer was made "without valuable consideration." *Albertson v. Robinson*, 371 S.C.

311, 317, 638 S.E.2d 81, 84 (Ct. App. 2006) (citing *McDaniel v. Allen*, 265 S.C. 237, 242-43, 217

---

[8] ECF No. 344, entered May 12, 2023.

S.E.2d 773, 775-76 (1975)).  However, even where the plaintiff shows the transfer was made without valuable consideration, the transfer will be set aside only when the plaintiff establishes: "(1) the grantor was indebted to the creditor at the time of the transfer; (2) the conveyance was voluntary; and (3) the grantor failed to retain sufficient property to pay his indebtedness to the creditor in full, not merely at the time of transfer, but in the final analysis when the creditor seeks to collect the debt." *Id.* (citing *Mathis v. Burton*, 319 S.C. 261, 265, 460 S.E.2d 406, 408 (Ct. App. 1995)); *see also Hanckel*, 512 B.R. at 549.

Plaintiff bears the burden of proof on all issues in this fraudulent transfer action. *In re Amelung*, 436 B.R. 806, 808 (Bankr. D.S.C. 2010).  The standard is clear and convincing evidence. *Oskin v. Johnson*, 400 S.C. 390, 396, 735 S.E.2d 459, 463 (2012).  Since it is uncontested that the Borrower Debtors were unable to pay their debts to the Second Lien Lenders, the Court will focus on whether (1) there is at least one creditor in whose shoes the Plaintiff can stand to pursue his avoidance claims, and (2) the 2012 Dividend and 2013 Dividend were voluntary transfers.  Since the Court concludes that the 2012 Dividend and 2013 Dividend were not voluntary transfers, its conclusion that the Second Lien Lenders may serve as triggering creditors is not essential to the holding.

## II.    TRIGGERING CREDITOR

As a threshold matter, there must be a creditor with a valid unsecured claim in the bankruptcy case who could assert a claim to avoid the transfer in whose shoes the Plaintiff now stands (*i.e.*, a "triggering creditor").  *See* 11 U.S.C. § 544(b)(1); *Hanckel*, 512 B.R. at 546 (quoting *Ducate*, 369 B.R. at 258).  Further, the creditor must also be an "existing creditor" at the time of the transfer.  Stating the obvious, a creditor is an "existing creditor" at the time of the transfer at issue if the debt was "in existence . . . ***at or before the time of the transfer***."  *Albertson*, 371 S.C.

at 317, 638 S.E.2d at 84 (emphasis added) (in an action for actual and constructive fraud under the Statute of Elizabeth after conveyance of real property from husband to wife for $5.00 and love and affection following the filing of a lawsuit against husband for an outstanding debt, finding that the inception of the debt or obligation was the controlling time).   Plaintiff argues that the Second Lien Lenders, Ellett's Trade Creditors, and the Town of Chapin may all serve as triggering creditors for purposes of Section 544(b)(1).   In support of his contention that the Trade Creditors and the Town of Chapin may serve as triggering creditors, Plaintiff argues "all that is required [for standing under § 544(b)] is that the same creditor hold a claim at the time of the transfer in question and at the time of the debtor's bankruptcy filing." *Katchadurian v. NGP Energy Cap. Mgmt., LLC (In re Northstar Offshore Grp., LLC)*, 616 B.R. 695, 723-24 (Bankr. S.D. Tex. 2020) (action under TUFTA §§ 24.005-24.006).[9]   Stated differently, Plaintiff argues that "while the so-called 'triggering' creditor must be the same creditor on both the transfer date and the date of commencement of the case, 'it need not hold the same claim at these two essential points in time.'" *Id*. at 723 (quoting 5 Collier on Bankruptcy ¶ 544.06).   Plaintiff argues that the "rolling credit" extended is sufficient to establish pre-existing creditors more than 5 years later even though the debts that existed at the time of the transfer were not the same as those that existed at filing, citing

---

[9] Section 24.005(a) provides:

(a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or within a reasonable time after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:

    (1) with actual intent to hinder, delay, or defraud any creditor of the debtor; or
    (2) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:
        (A) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or
        (B) intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.

TX. BUS. & COM. § 24.005(a).

*In re Bushey*, 210 B.R. 95, 102 (B.A.P. 6th Cir. 1997) (application of § 544(b) to invoke Ohio state fraudulent transfer law through an open credit card account with Citibank MasterCard held by an individual).

The Court agrees that the Second Lien Lenders may serve as triggering creditors for purposes of Section 544(b)(1).  It is not disputed that the Second Lien Lenders hold allowed unsecured claims in the bankruptcy case.  Further, the debt of the Borrower Debtors to the Second Lien Lenders that forms the bases of those claims existed when the 2012 Dividend and 2013 Dividend were issued.  Accordingly, Plaintiff may stand in the shoes of the Second Lien Lenders to pursue his avoidance claims under Section 544(b)(1).

Having found that the Second Lien Lenders may serve as triggering creditors, the Court need not agree with Plaintiff's argument that the Trade Creditors and the Town of Chapin may serve as such.  However, the Court notes its skepticism of Plaintiff's theory as it applies to the facts of this case and a Statute of Elizabeth constructive fraud theory.  As Defendants argue, *any* voluntary transfer, including corporate dividends paid by a then-solvent company and in compliance with applicable law, would be recoverable—even if made decades prior to any insolvency—as there would almost always be a triggering creditor, such as a utility provider, a taxing authority, etc.[10]  The Court is not prepared to endorse such a sweeping view at this time.

### III.    VOLUNTARY TRANSFERS

The Supreme Court of South Carolina has clarified that a conveyance is "voluntary" when it is gratuitous.  *Royal Z Lanes, Inc. v. Collins Holding Corp.*, 337 S.C. 592, 595, 524 S.E.2d 621, 622 (1999).  A voluntary conveyance has been further defined as "a conveyance made upon a mere nominal consideration or without consideration."  *Amelung*, 436 B.R. at 810 (quoting *First State*

---

[10] ECF No. 354, pgs. 29-30.

*Sav. and Loan Ass'n v. Nodine*, 291 S.C. 445, 450, 354 S.E.2d 51, 54 (Ct. App. 1987)); *see also In re J.R. Deans Co., Inc.*, 249 B.R. at 130-31 (quoting *Mathis v. Burton*, 460 S.E.2d at 408) (indicating a conveyance is voluntary when it is without consideration).  The Supreme Court of South Carolina has specifically rejected the argument that grossly inadequate consideration causes a transfer to be made without consideration and thus deemed voluntary, concluding "gross inadequacy of consideration and 'without consideration' are not synonymous in the law." *Royal Z Lanes*, 337 S.C. at 595, 524 S.E.2d at 622 (quoting *Jeffords v. Berry*, 247 S.C. 347, 351, 147 S.E.2d 415, 418 (1966)).  "Grossly inadequate consideration does not render a conveyance voluntary; rather, the inadequacy of the consideration is treated as a 'badge of fraud,' and actual intent to defraud must be proven." *Hanckel*, 512 B.R. at 549 (citing *Royal Z Lanes*, 524 S.E.2d at 622-23).  "Grossly inadequate consideration" has been defined as "a consideration so far short of the value of the property as to arouse a presumption in the mind that the person who takes that property takes it under some kind of secret trust." *McGhee v. Wells*, 57 S.C. 280, 35 S.E. 529, 531 (1900).  Consequently, "without consideration" requires even less.

"Valuable consideration to support a contract may consist of some right, interest, profit or benefit accruing to one party, or some forbearance, detriment, loss or responsibility given, suffered or undertaken by the other." *Factor King, LLC v. Dooleymack Constructors of S.C., LLC*, No. 2:17-cv-1845-PMD, 2017 WL 5001289, at *2 (D.S.C. Nov. 2, 2017) (internal quotation marks omitted) (quoting *Plantation A.D., LLC v. Gerald Builders of Conway, Inc.*, 386 S.C. 198, 206, 687 S.E.2d 714, 718 (Ct. App. 2009)).

Here, the Court must look at the transaction as a whole, in context, to determine whether the 2012 Dividend and 2013 Dividend were "voluntary" for purposes of the Statute of Elizabeth. "[A]n analysis of whether a conveyance was voluntary for purposes of the Statute of Elizabeth

appears to require an overall analysis of what was transferred, its value, and the consideration received." *Vieira v. Think Tank Logistics, LLC (In re Levesque)*, 650 B.R. 693, 703 (Bankr. D.S.C. 2023) (citing *Groves v. Daffin*, No. 8:13-19-BHH, 2016 WL 638817, at *3 (D.S.C. Feb. 17, 2016)). "A series of transactions under certain circumstances may be 'collapsed' and treated as a single transaction for the purpose of determining whether there has been a fraudulent conveyance." *LaRosa v. Pecora*, No. 1:07CV78, 2010 WL 3672335, at *12 (N.D. W. Va. Sept. 15, 2010) (citing *HBE Leasing Corp. v. Frank*, 48 F.3d 623, 635 (2d Cir. 1995)), *rev'd on other grounds sub nom. LaRosa v. LaRosa*, 482 F. App'x 750 (4th Cir. 2012); *see also LaRosa v. LaRosa*, 482 F. App'x at 755 n.3 (quoting *In re Sunbeam Corp.*, 284 B.R. 355, 370 (Bankr. S.D.N.Y. 2002)) (stating, in ruling on an appeal of an order on a West Virginia Uniform Fraudulent Transfer Act claim, "Certainly, we may collapse 'a series of transactions and treat[ ] them as a single integrated transaction.'"). "Specifically, '[c]ourts have 'collapsed' a series of transactions into one transaction when it appears that despite the formal structure erected and the labels attached, the segments, in reality, comprise a single integrated scheme when evaluated focusing on the knowledge and intent of the parties involved in the transaction.'" *Schlossberg v. Abell (In re Abell)*, 549 B.R. 631, 660 (Bankr. D. Md. 2016) (quoting *In re Sunbeam Corp.*, 284 B.R. at 370).

> This treatment is usually accorded in situations where a debtor who has exchanged property with another for fair consideration then gratuitously transfers that consideration to a third-party. . . .When the series of transactions are completed, the debtor remains with nothing while the counter-party to the first transaction receives the property and the counter-party to the second transaction receives the consideration.

*In re Sunbeam Corp.*, 284 B.R. at 370 (citations omitted).

Although not a Statute of Elizabeth case, *Orr v. Kinderhill Corp.*, 991 F.2d 31 (2d Cir. 1993) illustrates the principles above that "an allegedly fraudulent conveyance must be evaluated in context", "the plan must be viewed as a whole", and a court "will not turn a blind eye to the

reality that [a] transfer" was part of "a single, integrated transaction." *Id.* at 35 (internal quotation marks and citations omitted). *Orr* considered whether a corporate restructuring plan through which a parent company transferred real property to a newly-formed and wholly-owned subsidiary, each for $10 or less, and then subsequently distributed all subsidiary shares to the parent company's shareholders was a voidable fraudulent transfer under N.Y. Debtor Creditor Law § 273-a. That section provided:

> Every conveyance made *without fair consideration* when the person making it is a defendant in an action for money damages or a judgment in such an action has been docketed against him, is fraudulent as to the plaintiff in that action without regard to the actual intent of the defendant if, after final judgment for the plaintiff, the defendant fails to satisfy the judgment.

(Emphasis added). The subsidiary thereafter granted a security interest in the real property to a third-party defendant in support of a loan. The third-party defendant opposed a judgment creditor's attempt to claw back the assets of the parent company, asserting the sale of the property to the subsidiary increased its share value, which was entirely owned by the parent at the time of the transfers, thereby providing fair consideration. That court refused to analyze the transfers of property as an entirely separate transaction from the spin-off of subsidiary shares. Ultimately, it found that the entire restructuring plan lacked fair consideration and therefore the transfer of real property could be recovered. *Id.*

Plaintiff asserts that corporate dividends are always gratuitous one-way conveyances made without consideration, citing cases which all involved dividends paid by a company insolvent at the time or that became insolvent as a result of such transfers, and a different consideration threshold. *See W. Linn Paper Co. v. BTC-USA Inc.*, No. CIV. 13-1678 PAM/JJK, 2014 WL 6473430 (D. Minn. Nov. 18, 2014) (Sole employee and president/CEO emptied the company bank accounts, paying himself $270,000.00, and rendering the company insolvent and judgment proof.

That court applied Minn. Stat. § 513.45(a) of the Minnesota Uniform Fraudulent Transfer Act which sets a reasonably equivalent value standard); *see also In re Teknek, LLC*, 343 B.R. 850, 861 (Bankr. N.D. Ill. 2006) (Considering payments made to two members/shareholders making up 100% ownership of the defendant LLC. While operational, the LLC paid distributions and returns on capital greater than the amount of net income. Three and four months after ceasing operations, the company paid an additional $307,000.00 in distributions. Under the Uniform Fraudulent Transfer Act, such payment "that is not compensation or salary for services rendered is not a transfer in exchange for reasonably equivalent value."). However, the Statute of Elizabeth analysis only requires *some* value (something more than nominal consideration) to make the transfers <u>not</u> gratuitous; it does not require "fair" value or that the value be in direct or equivalent exchange for the transfers. Further, to quote Plaintiff's counsel, "the question is whether or not the value is given to the debtor. It doesn't have to come from the transferee…we're not saying that the consideration has to come from the defendants themselves." Transcript of Hearing Held on November 15, 2023, page 14, lns. 8-10, 23-24.[11]

The Court cannot find a case that applies the Statute of Elizabeth to a set of facts similar to those presented here. However, the Court finds it appropriate to treat the series of transactions here as a single transaction for the purpose of determining whether there has been a transfer voidable under the statute. As there is no allegation that the 2012 Dividend or 2013 Dividend were made with fraudulent intent or contrary to the agreements or law,[12] and the overall context of these transactions indicates some benefit was received by all Borrower Debtors, the Court concludes

---

[11] ECF No. 364.
[12] *See* S.C. Code Ann. § 33-6-400(c). Defendants' brief in regard to the SC Corp. Statute states: "To the extent that the corporate law of Delaware might be deemed to apply because SportCo was a Delaware corporation, it is substantively the same." ECF No. 354.

that the 2012 Dividend and 2013 Dividend were not voluntary transfers for purposes of the Statute of Elizabeth.

The stipulated facts indicate the Borrower Debtors (including Ellett)—which were solvent at the time—and the Second Lien Lenders, after due deliberation, without fraudulent intent, and motivated to provide a dividend to SportCo's shareholders, entered the Second Lien Loan Agreement. Under the Second Lien Loan Agreement, Borrower Debtors would receive a $170 million loan that was designed by that agreement to be used to (a) fund the 2012 Dividend to SportCo's shareholders, (b) pay down certain pre-existing debt of the Borrower Debtors, and (c) pay associated costs and fees to the Second Lien Lenders. Ellett—a wholly-owned subsidiary of USC, which was in turn a wholly-owned subsidiary of SportCo—paid the 2012 Dividend on behalf of SportCo, paid down certain pre-existing debt, and paid the Second Lien Lenders costs and fees associated with the transaction.

The same parties then executed the 2013 Loan Amendment, which was specifically designed with a further dividend to SportCo's shareholders in mind.[13] Under the 2013 Loan Amendment, the Borrower Debtors—including Ellett—would receive $60 million to pay a further dividend to SportCo's shareholders and associated loan fees of the Second Lien Lenders, and the Borrower Debtors would repay the Second Lien Lenders at the same interest rate as provided in the Second Lien Loan Agreement. The Second Lien Lenders were paid associated loan fees, and Ellett paid the 2013 Dividend to SportCo's shareholders.

Looking at these transactions as a whole, all parties involved received value: the Second Lien Lenders received fees and costs associated with the transactions and, for several years,

---

[13] The 2013 Loan Amendment and resulting funds would not have transpired without payment of the 2013 Dividend and the 2013 Dividend would not have occurred without the 2013 Loan Amendment. *See* Stipulated Facts, paragraph 39.

received principal and interest payments on the resulting debt; Ellett, along with the other Borrower Debtors, received funds to satisfy pre-existing debt and provide for payment of the dividends to shareholders; and the Defendants—shareholders by virtue of employment with and/or investment in the Borrower Debtors—received the dividends at issue. Therefore, the Court finds that Ellett received more than nominal consideration in the overall transaction and Plaintiff has failed to meet his burden of proving that the 2012 Dividend and 2013 Dividend payments were voluntary for purposes of the Statute of Elizabeth.

### IV.    EQUITABLE DEFENSE TO AVOIDANCE CLAIMS

Regardless of the merits of the Plaintiff's avoidance claims under Section 544(b)(1) and the Statute of Elizabeth, Defendants assert that Plaintiff's claims should be barred by some vague "balancing of the equities." Plaintiff asserts that there is no general equitable defense to the Statute of Elizabeth. Assuming for the sake of argument that such an exercise is appropriate and not moot by the Court's conclusion that Ellett received value in the transactions at issue, the Court does not find that the equities weigh strongly in favor of either side. The Second Lien Lenders, the Debtors, and the remaining Defendants were involved in for-profit business activities or investments. In the end, some won and some lost in this transaction. As in many bankruptcy cases, the supposed winners were sued to recover for the benefit of the supposed losers. Plaintiff/Trustee steps into the shoes of triggering creditors pursuant to § 544 for the benefit of all creditors. Any inequities of such a situation are not clear to the Court from these facts and do not support preclusion of claims under § 544 and the Statute of Elizabeth.

<u>CONCLUSION</u>

For the reasons stated above, the 2012 Dividend and 2013 Dividend paid to Defendants Todd Boehly, F. Hewitt Grant, Andrew Kupchik, and Charles E. Walker, Jr. were not voluntary transfers under S.C. Code Ann. § 27-23-10, commonly known as the Statute of Elizabeth, and judgment shall be entered in favor of these Defendants.

**FILED BY THE COURT**
**01/18/2024**



Chief US Bankruptcy Judge
District of South Carolina

Entered: 01/18/2024